THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ROBERT L. ROWE, Defendant-Appellant.

First District (5th Division)    No. 63028

Opinion filed January 28, 1977.

Theodore M. Becker, of Becker & Tenenbaum, and R. Eugene Pincham, both of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon, James S. Veldman, and William F. Ward, Jr., Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE LORENZ delivered the opinion of the court:

Following a bench trial, defendant was convicted of murder in violation of section 9—1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1973, ch. 38, par. 9—1) and sentenced to 14 years to 14 years and one day. On appeal he contends: (1) the trial court erroneously precluded him from testifying as to his state of mind at the time he shot the victim, and (2) he was not proved guilty beyond a reasonable doubt.

At trial the following pertinent facts were adduced.

*For the State:*

*Nathan McCain*

On June 8, 1974, he and another man were standing, talking on the northwest corner of 79th and May Streets. The weather was "nice," but hot and humid. "It was kind of light; kind of like haze, sunnylike." While they were talking, he noticed two men walking north on May. Defendant "looks like" one of the men. Fifteen to twenty feet behind the two men, also walking north, was a third man, later identified as Terry Grafton. Two teenagers were with Grafton. Defendant and his companion stopped at the alley. Defendant turned and walked back towards Grafton. The two men stopped within 2½ feet of each other. He was about 100 feet away and no one stood between himself and the men. Defendant faced him, while Grafton had his back to him. He saw nothing in Grafton's hands and heard nothing said. Defendant pulled a gun from his right front pants pocket, pointed the gun at Grafton's head and shot him. Grafton fell immediately. He could still see Grafton's hands, but nothing was in them. Defendant stooped down and looked at Grafton. He then stepped back, put his gun in his pocket, looked around and walked north to the alley, where he rejoined his waiting companion. They both then "trotted west."

On cross-examination he stated that the man he was talking to left to catch a bus at about the time defendant was walking toward Grafton. Although Grafton's back was to him, he could see his hands. They remained at his side. He admitted he could not be sure that defendant was the man he saw, although he looked like him. He did not see defendant or his companion come from any building. Although he acknowledged knowing the victim, they were not friends.

On redirect examination he stated that he did not see Grafton's hands above his waist. When Grafton was shot, his arms were at his side.

*Eli Smith—Chicago Police Officer*

On the afternoon of June 8, 1974, he received a call that a man had been shot at 7848 May. He arrived approximately two minutes later and found a black male with a head wound lying on the sidewalk. There were two or three young people there; however, he saw nothing near or about the body.

*Harold Huffman*

He is the homicide investigator who was assigned to investigate the shooting of Grafton. On June 9, 1974, he and his partner arrested defendant at his apartment. He informed defendant of his constitutional rights and defendant stated he understood them. Defendant then admitted shooting Grafton and told him that Grafton and two other men had threatened him the previous Friday night at the bar where he worked. Defendant also told him that on the day of the shooting he was walking down the street when Grafton came towards him, "so he took out his gun and went over." Defendant stated he was alone when this occurred.

Upon reaching headquarters he requested a written statement from defendant, to which defendant agreed. This time defendant told him he had been on the street when Grafton, whom he had never seen before, came up to him, pulled a knife, and requested a match. Defendant said he then shot him. Both he and his partner heard this statement, which he typed up. Defendant read it, admitted it was true, but refused to sign it.

On cross-examination he insisted defendant did not use the word "accidentally." However, defendant did say "the gun just went off."

*For defendant:*

*Dorethia Hill*

She and her husband Arthur operate Hill's Soul Food Restaurant at 1134 West 79th Street. At about 3:20 p.m. on June 8, 1974, Grafton and a woman came into their restaurant arguing. She asked them to leave. Grafton told her to mind her own "f_____ business," whereupon she screamed at him to leave. Finally, after she screamed "for so long," they both left. Grafton was shot after he left, but she did not witness the shooting nor did she see defendant or her husband around this time.

On cross-examination she admitted that she did not mention screaming at Grafton or Grafton's remarks to her in a statement given police at 10:10 p.m. the evening of the shooting.

*Defendant on his own behalf*

On June 8, 1974, at about 3:20 p.m., he and Arthur Hill were shooting pool at the Nairobi Inn when he heard a scream. They stepped outside and noticed a man (later identified as Grafton) leaving the Hill's Soul

Food Restaurant next door. Hill asked Grafton what was going on. Grafton told him to "Mind his own m____ f____' business." Defendant cautioned Grafton to watch his language. Grafton then said "What the f__ you got to do with it" and ran his hand into his pants, drawing a knife. The knife had a five-inch blade. He then drew his gun which accidentally went off. He looked down at Grafton, but did not see the knife, panicked and ran.

Although he had never carried this gun before, he had it on his person that day because he had been threatened the previous night by three boys at the tavern where he worked. When the gun went off he was holding it by the handle; however, he did not have his finger on the trigger. He denied aiming or pointing the weapon.

He admitted that he did not tell police about Hill being present because he did not want to get him involved. Although he admitted telling the officers about the threat of the previous night, he denied saying that Grafton was one of the men who threatened him.

On cross-examination he stated that when Grafton pulled the knife, he was standing directly in front of him. Grafton pulled the knife up, out, and right towards him. "When he pulled the knife, he turned as if he was going to kill" him. Grafton held the knife at waist level.

He denied telling the police that Grafton asked him for a match. Further, he claimed he told police about the knife in his oral statement to police. He also told them the shooting was "accidental."

*Arthur Hill*

He is the husband of Dorethia Hill. He substantially corroborated defendant's story. Specifically, he saw Grafton turn, reach into his pants and fall. He then ran. He heard a shot, however, he never saw a gun. Nor did he actually see a knife.

OPINION

■■ Defendant first contends that the trial court erroneously precluded him from testifying as to his state of mind at the time he shot the victim. Defendant's written post-trial motion does not set out the particular testimony excluded. Rather, it merely asserts that, "The Court erred in its rulings on the evidence." Having failed to specify the exact rulings which defendant objects to in either his written motion for a new trial or his oral argument on the motion, he has waived the issue for review. *People v. Witherspoon* (1975), 33 Ill. App. 3d 12, 337 N.E.2d 454; *People v. Virgin* (1973), 9 Ill. App. 3d 902, 293 N.E.2d 349.

Defendant next contends he was not proved guilty beyond a reasonable doubt. His hypothesis of innocence is a mixture of self-defense and accident. At trial he attempted to show that he was carrying a gun in order

to protect himself from several boys, who had threatened him the previous evening. When Grafton made a furtive gesture, he responded by pulling the gun, which accidentally went off. Defendant claims that his version is far more reasonable than the State's account, especially in light of his good character and apparent lack of motive.

Whether defendant acted in self-defense is a question to be determined by the trier of fact and that determination will not be disturbed on review unless the evidence is so improbable or unsatisfactory as to raise a reasonable doubt as to defendant's guilt. (*People v. Washington* (1963), 27 Ill. 2d 104, 187 N.E.2d 739.) Defendant's version, if believed, would support his theory of self-defense; however, here it only served to create a conflict in the evidence which does not of itself establish a reasonable doubt. *People v. Hobbs* (1966), 35 Ill. 2d 263, 220 N.E.2d 469, *cert. denied*, 386 U.S. 1024, 18 L. Ed. 2d 463, 87 S. Ct. 1381.

Although defendant claims he drew his weapon in self-defense, the only evidence that Grafton pulled a knife was defendant's self-serving testimony at trial. Even his first statement to police contained no reference to the knife. No one else saw the knife. Nathan McCain observed Grafton's hands empty at his side during the entire incident. Although Arthur Hill saw Grafton reach into his pants, he never actually saw a knife. Nor did Officer Smith, who arrived on the scene shortly after the shooting, find any weapon on or about the body.

In challenging this evidence, defendant first contends that the testimony of McCain is suspect. He argues that McCain could not have seen Grafton's hands because it was a "hazy" day and McCain was some 100 feet away engaged in conversation. Defendant asserts that McCain's poor perception is evidenced by the fact that he cannot even positively identify Rowe. He also claims that McCain's and his own testimony are consistent in that neither he nor McCain saw Grafton's hands above his waist.

■■ Defendant distorts the facts. This incident occurred on a summer afternoon. Although McCain did mention "haze" he also said it was "nice," "kind of light" and "sunnylike." More importantly, he insisted he had a clear unobstructed view of Grafton during the entire incident. Although he had been conversing with someone, this person left while defendant was still approaching Grafton. Neither does McCain's inability to make a positive identification cast doubt on his testimony. On direct, cross, and redirect examination McCain's account remained the same— Grafton's hands were visible, empty and stationary at his side.

■■ Defendant has alluded to the State's failure to call other eyewitnesses, inferring that perhaps these witnesses may have helped him. While such an inference is sometimes proper (*People v. DiVito*

(1966), 66 Ill. App. 2d 282, 214 N.E.2d 320) it has not been invoked where as here, an eyewitness testified directly as to the event, and his testimony is "clear and convincing" and "complete in all respects." *People v. Graham* (1970), 127 Ill. App. 2d 272, 277, 279, 262 N.E.2d 243, 246.

■■ Defendant also challenges the police testimony. He insists he told Officer Huffman about the knife as soon as he was picked up. Further, he hypothesizes that the reason Officer Smith found no weapon was that fellow gang members took the knife in an attempt to frame him.

The question of credibility is best left to the trier of fact whose determination we will not disturb unless it is improbable or contrary to human experience. (*People v. Marichec* (1976), 41 Ill. App. 3d 604, 353 N.E.2d 692.) Here the court chose to believe Officer Huffman and not defendant. In light of defendant's inconsistent statements we do not think this unreasonable.

Defendant also contends that the gun discharged accidentally and that he therefore lacked intent—a necessary element of murder. (*People v. Clemens* (1972), 9 Ill. App. 3d 312, 292 N.E.2d 232.) This too is a question for the trier of fact and where there is contradictory evidence they are not bound to accept defendant's self-serving story that the homicide was accidental. *People v. Carlton* (1975), 26 Ill. App. 3d 995, 999, 326 N.E.2d 100, 104.

■■ In the instant case, defendant testified the gun went off accidentally. However, McCain stated that defendant approached Grafton, drew a revolver, pointed it at Grafton's head and fired. In addition, Huffman testified that defendant said nothing about the gun firing accidentally in either of the accounts defendant gave police. Although defendant at trial disputed the testimony of both men, the court was well within the bounds of its discretion, when it chose to believe the State's witnesses.

■■ Defendant also asserts that the light sentence imposed on him indicates an apparent feeling on the part of the court that he committed the crime without intent. Defendant failed to include the transcript on the hearing on aggravation and mitigation, which would indicate the specific reasons for the trial court's sentence. We are, therefore, precluded from considering this issue. *People v. Sanders* (1975), 34 Ill. App. 3d 253, 339 N.E.2d 33.

■■ Finally, defendant argues that his contentions are further buttressed by his apparent lack of motive and his good character. However, "the State need not prove defendant's motive in order to sustain a conviction for murder." (*People v. Curry* (1969), 116 Ill. App. 2d 211, 216, 253 N.E.2d 466, 468.) Still, if required, motive could be found in the threat on defendant the previous night. More importantly, however, while both these factors might be significant in a close factual case, we

believe they are of little import here, where there is positive eyewitness to the occurrence.

For the foregoing reasons the judgment of the circuit court is affirmed.

Affirmed.

SULLIVAN, P. J., and DOWNING, J., concur.