THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
MAURICE PENDLETON, Defendant-Appellant.

First District (5th Division)    No. 76-1116

Opinion filed August 12, 1977.

James Geis and Steven Clark, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon, James S. Veldman, and William F. Ward, Jr., Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE SULLIVAN delivered the opinion of the court:

After a jury trial, defendant was found guilty of the murder of Deborah Goodlow and sentenced to 100 to 199 years imprisonment. On appeal, he presents the following issues for review: (1) whether defense counsel's position as a special assistant Attorney General constituted a conflict of

interest which denied him the effective assistance of counsel; and (2) whether references to another crime denied him a fair trial.

Defendant had initially been charged with the murders of Dewey Crockett and Deborah Goodlow; but, in a prior trial, was convicted only of the Goodlow murder—which conviction was reversed on appeal and the cause remanded for a new trial. (*People v. Pendleton* (1974), 24 Ill. App. 3d 385, 321 N.E.2d 433.) Defendant's second trial resulted in a mistrial being declared during the jury's deliberation, and it is the third trial—in December 1975 (referred to as the trial) which is the subject of this appeal.

On September 24, 1975, defendant's attorney, who had been appointed to represent him a month before, petitioned the court to withdraw, alleging that certain of his professional obligations precluded an adequate opportunity to prepare defendant's case. Included in the list of professional duties were two cases in which he had been appointed and was currently acting as a special assistant Attorney General. Defendant had previously requested the withdrawal of two former attorneys and, because he expressed regret at losing the services of another, the trial court questioned defendant and his attorney to ascertain whether they were personally satisfied with each other. Finding that they were, the court asked the attorney to reconsider whether his schedule would allow his continuation in the matter and, after an off-the-record discussion with defendant, his attorney withdrew the petition.

On December 8, 1975, prior to the commencement of jury selection, defendant's attorney informed the court and defendant that although he had six years of criminal law experience, including at least 60 bench trials, he had never tried a criminal case before a jury. At defendant's request, an attorney from the Chicago Bar Association Defense of Indigent Prisoners Committee was appointed to act as co-counsel to provide advice concerning the practices and procedures appropriate to jury trials. While defendant's original attorney principally conducted the defense during trial, his co-counsel was at all times available for consultation and actually argued several matters before the trial court. Shortly after the State rested, however, defendant alleged that both defense attorneys had been deceiving him and, thereafter, he was permitted to defend himself with both attorneys in attendance as legal advisors. Later, for the purposes of post-trial motions, the same two attorneys were again appointed as defense counsel.

As a detailed summary of the evidence given in the first trial was reported in *Pendleton* and, as the testimony relevant to the issues before us is substantially the same, only those facts pertinent to this appeal will be set forth. It appears that at approximately 3 a.m. on March 31, 1970,

Dewey Crockett and a man identified as defendant entered the Madison Park Hotel to visit Deborah Goodlow, a resident of the hotel. The two men were observed entering the elevator after receiving Deborah's permission to come to her apartment. Thirty to forty-five minutes later, Deborah, in a hysterical condition, entered the lobby from the stairwell and, begging for help, screamed that someone had been shot in her apartment. A hotel employee suggested that she hide behind the front desk, but she instead ran into a hallway in the western portion of the lobby and went out of the building through an exit there to an adjacent alley which ran north to Madison Park Street and south to Hyde Park Boulevard. Meanwhile, defendant exited the elevator and headed for the lobby's entrance onto Hyde Park. As he was opening the door, knocking could be heard coming from the west hallway, and defendant then changed direction and walked toward that hallway—from which he left through the same door Deborah had used.

From an apartment with a northern exposure and located half a block west of the hotel, a witness heard Deborah screaming and observed her running down Madison Park in a westerly direction with a man he identified as defendant pursuing and eventually overtaking her. When they were within five feet of each other, she stopped, turned, and raised her hands in the air. Whereupon, defendant first shot her in the upper torso and, as she fell to her knees, shot her again in the face at point blank range.

At trial, defendant contested his identification in that the witnesses did not have adequate opportunities for observation under favorable conditions and because some of them gave vague and uncertain testimony.

Opinion

Defendant (represented on appeal by the State Appellate Defender) first contends that he was denied the effective assistance of counsel. He points to no specific conduct during the course of trial which would demonstrate the inadequacy of counsel, but he asserts that his attorney's commitment to the attorney general's office, whose interests conflicted with his, constituted a per se denial of the effective assistance of counsel. Initially, the State argues that the issue was not preserved for appeal. We disagree.

■■■ As a general rule, the failure to specify alleged errors in a written motion for a new trial or during argument on that motion waives these issues, and they cannot be urged as grounds for reversal. (*People v. Rowe* (1977), 45 Ill. App. 3d 1040, 360 N.E.2d 436; *People v. Witherspoon* (1975), 33 Ill. App. 3d 12, 337 N.E.2d 454; *People v. Spencer* (1972), 7 Ill. App. 3d 1017, 288 N.E.2d 612.) While an attorney is ordinarily not

expected to include his own inadequacy as a ground for reversal (*People v. Van Dyke* (1969), 106 Ill. App. 2d 411, 245 N.E.2d 324), the State, citing *People v. Wise* (1942), 379 Ill. 11, 39 N.E.2d 319, argues that the issue of the ineffective assistance of trial counsel is waived where not raised in the post-trial motion of a second attorney who did not partake in the alleged error.

Here, co-counsel was appointed six weeks after the original attorney's affiliation with the Attorney General's office was mentioned in his petition to withdraw. Moreover, because original counsel had extensive experience in bench trials, it appears that co-counsel's appointment was not because of any possible conflict resulting from counsel's association with the attorney general; but, rather, was to provide advice and assistance relating to the nuances of trying a case before a jury. Under these circumstances, we find *Wise* inapposite. In that case, the second attorney appeared after sentencing and, of necessity, would have had to review the proceedings—which should have disclosed the conduct complained of prior to filing the post-trial motion; but, nonetheless, he failed to raise the issue of incompetency of trial counsel. Here, however, co-counsel was present during the entire trial and, because he was only assisting in the preparation of the post-trial motion, we cannot say that he should have known of an indicated conflict as he would not necessarily have been required to make a detailed examination of the record. In any event, we have found nothing to indicate that co-counsel was aware of the possible conflict. Consequently, we will consider the issue.

Effective assistance of counsel is a fundamental right, and an accused is entitled to the undivided loyalty of counsel free of commitments to others. (*Glasser v. United States* (1942), 315 U.S. 60, 86 L. Ed. 680, 62 S. Ct. 457.) This right is deemed to have been denied where the interests of codefendants represented by a single attorney are potentially inconsistent (*Glasser*), where a fee earned through the representation of another client will be enhanced in the event of a less than vigorous defense of the accused (*People v. Meyers* (1970), 46 Ill. 2d 149, 263 N.E.2d 81), where the future business of another client may not be forthcoming should a successful defense of the accused result (*People v. Stoval* (1968), 40 Ill. 2d 109, 239 N.E.2d 441), and where the defense attorney is the recipient of the special assignment of cases by a State office (the Illinois Attorney General) which, under certain circumstances, is charged with the duty of prosecuting criminal cases (*People v. Cross* (1975), 30 Ill. App. 3d 199, 331 N.E.2d 643), but not where the defense attorney has terminated his employment as a prosecutor subsequent to defendant's indictment (*People v. Newberry* (1973), 55 Ill. 2d 74, 302 N.E.2d 34), unless there was an earlier representation of the State in that particular case (*People v. Kester,* (1977), 66 Ill. 2d 162, 361 N.E.2d 569). In *Cross*, defendant's trial

counsel also served as a special assistant Attorney General for the purpose of handling inheritance tax matters, and the court held, "The attorney's representation of the defendants on the one hand and his affiliation with the Attorney General's office on the other constituted a per se conflict of interest."

██ Should defense counsel's commitment to others give rise to interests potentially conflicting with those of defendant, no actual prejudice need be shown. (*People v. Fuller* (1974), 21 Ill. App. 3d 437, 315 N.E.2d 687.) The policy reason supporting this rule was succinctly stated in *Stoval*:

> "There is no showing that the attorney did not conduct the defense of the accused with diligence and resoluteness, but we believe that sound policy disfavors the representation of an accused, especially when counsel is appointed, by an attorney with possible conflict of interests. It is unfair to the accused, for who can determine whether his representation was affected, at least, subliminally, by the conflict. Too, it places an additional burden on counsel, however conscientious, and exposes him unnecessarily to later charges that his representation was not completely faithful. In a case involving such a conflict there is no necessity for the defendant to show actual prejudice. [Citations.]" 40 Ill. 2d 109, 113, 239 N.E.2d 441, 444.

Nevertheless, the State contends that no conflict existed in this case—that even if a conflict should be found, actual prejudice must be shown and that, even assuming actual prejudice need not be shown, defendant's rights were adequately protected by the appearance of co-counsel. Again, we disagree.

First, the State argues that *Cross* was too stringent in finding a per se denial of the right to the effective assistance of counsel in defense counsel's mere affiliation with the Attorney General's office. It asserts that the rule used in attorney discipline proceedings; *i.e.*, an attorney who holds public office may not accept private employment in matters over which he may potentially have responsibility as a public official (Illinois Code of Professional Responsibility, DR 8—101(A)(5) (1970)) ought to be applied to the facts on a case by case basis. In applying this criteria to the case at bar, the State concludes that counsel's "public office" was limited to two specific cases in which his public responsibility did not encompass the prosecution of murder cases, and it argues that no conflict resulted. We believe the State misapprehends the question involved and the policy reasons upon which the conflicts rule is grounded.

Here, defendant's attorney recited two active cases among his work load in which he was empowered to represent the people. The record does not disclose, however, the extent of either his prior involvement with

or his future expectancies from the Attorney General's office. The controlling aspect is not whether he personally would ever be assigned to assist in the prosecution of a murder case, but whether he is presently accepting and perhaps seeking future assignments from an office which possesses an interest adverse to defendant's; *i.e.*, the duty to assist in the prosecution of criminal cases whenever the interests of the people require it. (Ill. Rev. Stat. 1975, ch. 14, par. 4.) Viewed in this light, the reasoning of *Stoval* is particularly cogent. There, the supreme court noted that although defense counsel's firm's representation of the burglarized business and its owner was not directly involved in defendant's burglary trial, human nature being what it is, an acquittal or light sentence might cause the owner to take his future legal business elsewhere. So, too, in the instant case, the possibility is raised that future assignments from the Attorney General's office might be affected in some manner by counsel's conduct of the trial and/or the ultimate disposition of defendant's case.

Moreover, we think that *Kester, Meyers*, and *Stoval* make it clear that, as a matter of sound judicial administration, lawyers who are committed to others with potentially adverse interests to those of defendant should not be appointed. These decisions recognized that when matters of judgment and trial tactics are made in the name of the accused by an attorney with such concurrent commitments, even the most loyal and resolute defense attorney might be able to conclusively establish the propriety of his actions, and it should be noted that none of these cases were grounded upon findings that the attorneys involved were subject to disciplinary action because they transformed what should have been adversary proceedings into shams through the representation of both sides in the same matter. Consequently, we believe that whether the representation of defendant here by an attorney concurrently accepting assignments as a special Attorney General amounted to censurable conduct, is immaterial to the question whether defendant was denied the right to the effective assistance of counsel.

■■ Second, the State argues that defendant must make a threshold showing of some actual prejudice. It finds support for its position in the following language in *Glassner*:

> "To determine the precise degree of prejudice sustained by Glassner as a result of the court's appointment of Stewart as counsel for Kretske is at once difficult and unnecessary. The right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the *amount* of prejudice arising from its denial. [Citations.]" (Emphasis added.) (315 U.S. 60, 75, 76, 86 L. Ed. 680, 702, 62 S. Ct. 457, 467.)

We find the State's suggested interpretation of *Glasser* to be untenable, as immediately following the quoted statement it was held to be error of

constitutional dimension for the trial court to appoint an attorney when apprised that to do so would commit counsel to the interests of defendant and another whose interests were potentially inconsistent. In the case at bar, the trial court was informed of counsel's association with the Attorney General's office prior to trial by the petition to withdraw. Under *Glasser*, defendant was at that point denied the right to the effective assistance of counsel and, therefore, *Glasser* can yield no authority for the proposition that defendant must adduce some act or omission by counsel during the course of trial to make a threshold showing of actual prejudice.

Third, assuming arguendo that a conflict existed and actual prejudice need not be shown, the State argues that co-counsel adequately protected defendant's rights. It relies upon *Commonwealth v. Wakeley* (1969), 433 Pa. 159, 249 A.2d 303, which involved a defense attorney who had severed his employment as a prosecutor subsequent to defendant's indictment but who apparently had no personal involvement in the early stages of defendant's case. After noting that "[i]t would perhaps be enough to answer that appellant was represented at trial by *two* attorneys, and had one of them had a conflict, the other was in a position to protect appellant's interests," the Pennsylvania Supreme Court found that no conflict existed. 433 Pa. 159, 162, 249 A.2d 303, 304.

Initially, it can be noted that the quoted language in *Wakeley* is phrased as an aside and that the facts would not have raised a conflict under Illinois law. (*Newberry*.) Secondly, we do not believe that the existence of co-counsel can be a complete answer; particularly where, as here, it does not appear that co-counsel was informed of the conflict and his duties were limited to advice and assistance concerning the tactical aspects of a jury trial.

■■ *Kester, Meyers,* and *Stoval,* in discussing the issue of waiver, observed that the influence upon counsel may be subliminal and extremely difficult to detect. As matters of judgment and trial tactics are influenced by numerous tangibles and intangibles, it is difficult to see how co-counsel, when unaware of the conflict, can offer defendant effective protection. Considering the subtleties involved, we believe that the following paraphrase of *Stoval* is the better rule concerning the issues of waiver and the effect of the existence of co-counsel: "The difficulty in appropriately advising an accused of this right [or in co-counsel detecting which decisions may have been subliminally affected by an unknown conflict] almost directs that counsel, especially one appointed, be free from any such conflict." (40 Ill. 2d 109, 114, 239 N.E.2d 441, 444.) Consequently, we hold that where the defense attorney possesses a conflict arising from a commitment to others whose interests are inconsistent with those of defendant, the mere existence of co-counsel who has no knowledge of the conflict cannot offer an accused adequate

protection, and that original counsel's appointment per se denied defendant the right to the effective assistance of counsel.

■■■ Defendant also contends that he was denied a fair trial by references to the commission of another crime. We agree.

" 'Evidence which tends to prove a fact in issue is admissible though it may be evidence showing that the accused has committed a crime other than the one for which he is being tried, and evidence which goes to show motive, intent, identity, absence of mistake or *modus operandi* is admissible though it may show the commission of a separate offense.' [Citation.]" (*People v. Romero* (1977), 66 Ill. 2d 325, 330, 362 N.E.2d 288, 290.)

Where, however, in the commission of the other crime, it is some (but less than all) of the accused's behavior which is probative rather than the actual commission of a crime itself, the testimony must be tailored so that the jury is apprised only of the behavior and not the commission of a crime. (*People v. Butler* (1974), 58 Ill. 2d 45, 317 N.E.2d 35; *People v. Brown* (1972), 3 Ill. App. 3d 1022, 279 N.E.2d 765. See also *People v. Hicks* (1971), 133 Ill. App. 2d 424, 273 N.E.2d 450.) Furthermore, a prosecutor may not indicate during argument that such behavior constituted the commission of a crime. (*Brown.*) Where evidence of another crime has been erroneously placed before the jury, the State bears the burden of affirmatively showing that the error was not prejudicial. *Romero.*

Here, the testimony revealed that Dewey and defendant were frequent companions; that on the date in question he accompanied defendant to the hotel; that they entered the elevator to visit Deborah's apartment; that someone was shot in that apartment prior to her excited entry into the lobby; that defendant alone came down from her apartment and followed her out of the hotel; and that Dewey died on the same date as did Deborah. In closing argument, the prosecutor reminded the jury that they died on the same day. He also termed defendant as Dewey's "supposed" friend and imparted the additional information that when Dewey's father was called to the scene, he gave defendant's name to the police; whereupon, they included defendant's picture in the photographic spread shown to the witnesses. It cannot be gainsaid that Dewey's murder itself was probative of motive, intent, identity, absence of mistake, or *modus operandi* relevant to Deborah's murder. Therefore, as much of defendant's behavior as tended to make any fact at issue more or less probable was admissible (*People v. Allen* (1959), 17 Ill. 2d 55, 160 N.E.2d 818), but only to the extent that the factual pattern revealed did not directly or indirectly show the actual commission of another crime (*Butler; Brown*). This principle ought to be strictly applied in cases where, as here, the accused was acquitted of the other crime.

■■ As it would unduly lengthen this opinion to recite the probative

value of each testimonial unit relative to Dewey, suffice it to say that while, under *Allen,* each individual fact may have been admissible as probative of the crime charged, in combination we find them so complete that the jury was thereby informed of defendant's likely involvement in the death of Dewey. The problem could have been, in our opinion, eliminated by the exclusion of Dewey's exact date of death, as it was a fact of least probative value and, at the same time, the most inflammatory in completing the picture of the commission of another crime. While the State is entitled to explain his absence as a witness to rebut any adverse inference (*People v. Weinstein* (1965), 66 Ill. App. 2d 78, 213 N.E.2d 115, *rev'd on other grounds* (1966), 35 Ill. 2d 467, 220 N.E.2d 432), this could have been accomplished by testimony to the effect that he was deceased at the time of trial. Moreover, we think that any question in the jurors' minds which would have operated in favor of defendant's presumption of innocence was unfavorably affected by the prosecutor's argument informing them that Dewey's father was called to the scene of his son's murder and that he gave defendant's name to the police to assist them in identifying his son's murderer.

Finding that evidence of another crime was erroneously adduced at trial, the question remains whether the State has affirmatively shown that the error was nonprejudicial. (*Romero.*) Our review of the record demonstrates to our satisfaction that the State has failed this burden and that the case must accordingly be remanded for a new trial.

To avoid the recurrence of prejudicial error, we would call attention to the procedure followed by the trial courts in *Butler* and *Brown.* In those cases, pursuant to defense objections, the trial courts listened to summations of the prospective testimony of witnesses prior to their taking the stand and instructed the prosecutors regarding what facts may and may not be elicited.

■■ In the case at bar, defendant's motion in limine to exclude evidence pertinent to Dewey's murder was denied, as the trial court ruled that the relevancy of evidentiary matters is more properly ruled on as each fact arises. We do not agree with this general principle; however, since the effect of the erroneous admission of other crimes evidence can be so highly prejudicial (*People v. Deal* (1934), 357 Ill. 623, 192 N.E. 649), we believe that in factual situations such as we have here the better practice is set forth in *Butler* and *Brown.*

We note further that defendant, in his closing argument, informed the jury that he was acquitted of Dewey's murder. While we can understand his possible frustration and impatience resulting from the nature of the prosecutor's argument, we must remind him that in representing himself he is bound to abide by the law and seek relief in this court, rather than to

further inflame the jury by introducing matter not in evidence through his argument.

For the foregoing reasons, the judgment of the circuit court is reversed and the cause is remanded for a new trial.

Reversed and remanded.

LORENZ and WILSON, JJ., concur.