Ivie CLAY, Petitioner,

v.

**DIRECTOR, JUVENILE DIVISION, ILLINOIS DEPARTMENT OF CORRECTIONS, Respondent.**

No. 79 C 1491.

United States District Court, N.D. Illinois, E.D.

May 11, 1983.

MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

■ Ivie Clay ("Clay") has filed a habeas corpus petition against the Director of the Juvenile Division ("Director") of the State of Illinois Department of Corrections ("Department").[1] Clay advances several grounds for relief:

1. Her guilty plea was involuntary because she (a) was ignorant of available defenses and (b) misunderstood the terms of her plea agreement.

2. She received inadequate representation from Assistant Public Defenders Roger Harris ("Harris") and Saul Friedman ("Friedman") both when she pleaded guilty and in connection with her motion to vacate the guilty plea.

3. Denial of the motion to vacate deprived Clay of due process because she was unconditionally entitled, according to the trial court's own representations, to withdraw her plea if her sentence did not accord with the plea agreement.

Director now moves for summary judgment under Fed.R.Civ.P. ("Rule") 56.[2] For the reasons stated in this memorandum opinion and order, Director's motion is granted.

### Facts

On August 8, 1977 Clay (then 15 years old) was arrested for aggravated assault and charged with delinquency. Because of Clay's indigency, Friedman was appointed as her counsel. At the initial interview Clay disclosed facts that might have established certain legal defenses to the charge against her. But Friedman did not apprise her of the availability of such defenses. Instead he urged her to enter into a plea agreement and plead guilty.

John Elson, Northwestern University Legal Clinic, Chicago, Ill., for petitioner.

Neil F. Hartigan, Atty. Gen. of Ill., Terence M. Madsen, Asst. Atty. Gen., Chicago, Ill., for respondent.

1. When Clay first brought this habeas action, she was on parole from a commitment to Department until her twenty-first birthday. Then on July 2, 1979 she received a final discharge from Department. That discharge does not moot this litigation, for Clay still suffers a serious "collateral consequence" of her delinquency adjudication: the potential for harsher sentencing on any future conviction. *See* Feb. 25, 1981 Memorandum Opinion and Order.

2. This Court first received this case on remand from our Court of Appeals' reversal of an earlier dismissal of Clay's petition, 631 F.2d 516 (7th Cir.1980). This opinion later deals with the impact of that earlier determination on the current issues.

Unaware of any other option, Clay followed that recommendation on the understanding her plea agreement foreclosed any possibility of actual commitment. But that belief was apparently mistaken, for both Friedman and the Assistant State's Attorney handling the case have stated by affidavit that their only agreement was to amend the Complaint to read that the weapon used was a knife rather than a gun.[3]

On September 28, 1977 Clay admitted her guilt before Cook County Circuit Court Judge Rogers. After Clay acknowledged her guilty plea had been induced by a plea agreement, Judge Rogers advised her of her unconditional right to withdraw the admission if he refused to accept the agreement. On October 26, 1977 Judge Rogers found Clay guilty of delinquency and committed her to Department. Even though that sentence represented a rejection of Clay's version of the plea bargain, Friedman neither moved to withdraw her admission nor informed her of her right to do so.

Convinced that Friedman had bungled the case, Clay's mother Ina immediately telephoned Assistant Director John Elson ("Elson") of the Northwestern University Legal Clinic (the "Clinic") for help.[4] Ina Clay Dep. 126. She told Elson her daughter had been promised probation in return for her guilty plea and Friedman "had sold her down the river." Elson Dep. 67–69.[5] Elson told Mrs. Clay he was too busy to represent her daughter but offered to consult with Friedman and "see if he would do anything about it." Elson Dep. 61. Mrs. Clay agreed. *Id.*

Elson called Friedman the next day, apprising him of Mrs. Clay's belief her daughter had been misinformed that her admission of guilt could not lead to commitment. Friedman apparently agreed with that assessment, acknowledging "there was a real

problem with what Ivie Clay understood." Elson Dep. 86. Friedman said he would file a motion to vacate her guilty plea, assuring Elson "he didn't think there would be a big problem with the matter." Elson Dep. 87–88.

■ On November 4, 1977 Friedman called Elson to give him a general status report. Friedman said "he was processing the papers on the case and would have them done shortly and have the transcript typed up." Elson Dep. 76. On November 22 (within the prescribed 30-day period) Friedman filed the motion to vacate, using a standard printed form with blanks for the name of the "respondent" (in this case Clay). Needless to say, the form was seriously deficient as a presentation of Clay's specific basis for relief:

1. It refers to respondent Clay throughout as a male.

2. It advances very generalized grounds for vacating the plea, none of which really encompassed Clay's present habeas claims (this is a literal transcription of the form, warts and all):

4. That the minor respondent did not fully comprehend the significance of his admission.

5. That the minor respondent was not admonished in his admission, in that there was no affirmative showing that the court informed the minor respondent and determined that said minor understood:

(a) the nature of the charge

(b) the penalties the minor may be subjected to upon his admission to the offense, including commitment to the Department of Corrections until the age of twenty-one

(c) that the minor respondent has a right not to enter an admission or to

---

3. Because that amendment merely rectified a clerical error (and thus reflected the undisputed facts), Clay derived no benefit from the agreement.

4. Apparently Elson and the Clinic had previously represented Mrs. Clay and other family

members. Elson Dep. 62. Elson is now acting as Clay's counsel in this habeas proceeding.

5. Elson is not "absolutely" certain whether the "down the river" remark was made during that or a later conversation with Mrs. Clay. Elson Dep. 68–69.

persist in that admission if it has already been made

(d) if the minor respondent enters an admission there will not be a trial of any kind and that by so admitting the offense he waives the right to a trial and the right to be confronted with the witnesses against him.

6. That the minor respondent now urges that his admission was induced by coercion of the police and/or their agents, by the use of force, threats or promises.

7. That the minor respondent now urges that his admission was induced by the use of illegally obtained evidence.

8. That the court failed to determine first when accepting the minor's admission whether there was an agreement and if there was said agreement said court failed to inquire as to the terms of this agreement.

9. The court failed to determine a factual basis for the admission when it entered a final judgment on the minor respondent's admission.

10. The court failed to admonish the minor respondent in accordance with the provisions of Supreme Court Rule 605.

3. It failed to identify the most compelling basis for relief: Judge Roger's statement that Clay had the absolute right to withdraw her guilty admission if he refused to honor the plea agreement, coupled with Clay's specific understanding no commitment would be imposed.[6]

On February 24, 1978 Judge Rogers held a hearing on the motion to vacate. Instead of arguing the motion himself, Friedman arranged for Harris, another Assistant Public Defender, to attend the hearing. Because Harris was totally unfamiliar with the case, he declined to present any argument in support of the motion. Nor was any effort made to secure Clay's presence at the hearing or to inform her or her mother about the motion.[7] Not surprisingly, Judge Rogers denied the motion.

Though not then aware of the February 24 hearing and its outcome,[8] Elson learned in early March that "nothing had happened" on the Clay matter.[9] Elson Dep. 110. Consequently Elson changed his earlier position declining direct representation of Clay. On March 10 he filed (1) a petition to substitute himself and Bak (a Certified Senior Law Student) for the Public Defender's Office as Clay's counsel and (2) an amended motion to vacate judgment. On March 16 Elson entered an appearance in the case.[10]

**6.** Paragraphs 4 and 5(b) of the form's boilerplate assertions might be argued to embrace Clay's involuntary plea claim. But that could only be said fairly if the boilerplate were buttressed by specific factual allegations. And as the text of this opinion reflects, no such support was provided either in writing or orally. Indeed the very use of a standardized form creates a climate in which the court is likely to view the Public Defender as simply going through the motions, depreciating the seriousness and force of the individual's claim. If it were really necessary (due to secretarial burdens or otherwise) to resort to a form, at a minimum we might expect one in which the truly applicable grounds were to be checked off and space was left for *some* elaboration. As matters stand, the presence of such wholly inapplicable matters as Paragraphs 6, 7 and 9 (for example) must lessen the prospect the *real* claims will be heeded.

**7.** Indeed, neither Clay nor her mother was apprised of any continued involvement of the

Public Defender's Office after the October 26, 1977 delinquency adjudication.

**8.** During December 1977 or January 1978 Elson had a chance encounter with Friedman at the Juvenile Court—their last contact before Elson filed his appearance in open court March 16 (with Friedman present). During that earlier brief conversation Friedman told Elson in general terms "that matters were progressing, that things were going along." Elson Dep. 79.

**9.** That information stemmed from a contact between Clay or her mother on the one hand and Elson or Northwestern student and Clinic participant Patricia Bak ("Bak") on the other. Elson Dep. 114.

**10.** There is a sharp dispute as to whether Elson's (and the Clinic's) representation of Clay began any earlier than March 1978. Evidence on that score is conflicting. On the one hand Elson expressly declined to serve as Clay's

Elson's amended motion asserted only two grounds for relief (quoted verbatim from the motion):

> 4. That in admitting certain of the allegations made against her, IVIE CLAY did not understand that the Court would construe such admissions as an admission of having committed a delinquent act.
>
> 5. That Respondent never intended to waive her defenses of self-defense and defense of her family from imminent life threatening harm.

No mention was made of Harris and Friedman's incompetent representation, apparently because Elson had not yet seen the original motion to vacate or learned of the manner in which it had been presented at the February 24 hearing. Elson learned of those developments when he appeared before Judge White to argue the amended motion. Elson Dep. 80. At that time (a date that cannot be gleaned from the record) Judge White reset the motion for April 28 before Judge Rogers, who was then on vacation. At Elson's request Judge White directed the court reporter to prepare a transcript of the February 24 proceedings. On March 26 the 30 day period for an appeal from the denial of the original motion to vacate elapsed.

At the April 28 hearing Elson (having familiarized himself with Friedman's and Harris' conduct on Clay's behalf) urged ineffective assistance of counsel as a basis for considering the amended motion and vacating Clay's delinquency adjudication. *See* April 28, 1978 Report of Proceedings 11. Judge Rogers refused to entertain the motion, primarily on grounds of untimeliness: It was not filed within 30 days of the October 26 order of commitment.[11] Believing the state procedural rule invoked by Judge Rogers foreclosed any other state remedies, Elson filed this habeas petition on Clay's behalf.

### Summary Judgment Motion

 Director's summary judgment motion urges the "waiver" principles of *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1976) bar consideration of Clay's habeas claims.[12] Under *Wainwright* a state prisoner who fails to satisfy state procedural requirements for judicial review of an issue cannot raise that issue in a federal habeas proceeding unless he shows good cause for and prejudice from his procedural default.[13] Director's waiver contention therefore entails a two-step inquiry:

---

counsel during his October 26, 1977 conversation with Clay's mother and had minimal contact with both Clay and the mother during the period in question. On the other hand the actions of other Clinic representatives (and perhaps Elson as well) suggest a different pre-March 1978 relationship between the Clinic and Clay:

> 1. Elson himself had informed Friedman of possible grounds for vacating Clay's admission and kept abreast of the representation provided by the Public Defender's Office.
> 2. Shortly after her initial talk with Elson, Mrs. Clay (apparently on her own initiative) had a personal interview with some Clinic participant, who left her with the impression she had retained the Clinic. Ina Clay Dep. 126–28.
> 3. Before March 1978 Bak (as a Clinic representative authorized to do so by Elson) met with Clay on several occasions. Though those discussions centered on other unrelated matters, Bak also asked about the delinquency proceedings. Elson Dep. 65–66, 94–95.

On this summary judgment motion, the disputed fact issue is resolved against Director, and Elson's representation is considered to have begun in mid-March 1978.

11. As a secondary ground for rejection of the motion, Judge Rogers noted res judicata principles precluded relitigation of claims that could have been raised in the previously-denied motion to vacate.

12. Though seeking summary judgment as to all Clay's habeas claims, Director's motion refers only to the ineffective assistance of counsel claim. Nevertheless, because all those habeas claims call for the same waiver analysis, this Court will treat Director's motion as a Rule 56 challenge to Clay's entire petition.

13. Post-*Wainwright* case law emphasizes the importance of comity: *Wainwright*'s waiver doctrine is designed to afford state courts (presumed to be just as solicitous of federal constitutional values as federal courts) an adequate opportunity to rectify any constitutional defects in their criminal proceedings. *See Engle v. Isaac,* 456 U.S. 107, 102 S.Ct. 1558, 1572, 71 L.Ed.2d 783 (1982); *United States ex rel. Spur-*

1. Was Clay free, on a direct appeal from denial of the *original* motion to vacate, to assert the claims now advanced in this habeas proceeding—even though they had not been presented to the trial court in that original motion?

2. If so, did Clay forfeit her federal habeas remedy under the *Wainwright* cause-prejudice test by failing to take such a direct appeal? [14]

As for the first question, Illinois case law confirms the availability of appellate review of all three habeas claims: [15]

1. Because Friedman's post-trial motion would not have been expected to impugn his own competency at Clay's initial admission-of-guilt hearing, that claim could have been pursued for the first time on appeal. *People v. Harrawood,* 66 Ill.App.3d 163, 167, 22 Ill.Dec. 899, 901, 383 N.E.2d 707, 709 (5th Dist.1978); *People v. Pendleton,* 52 Ill.App.3d 241, 244–45, 9 Ill.Dec. 762, 765, 367 N.E.2d 196, 199 (1st Dist.1977).

2. That same analysis would permit assertion of the other two habeas claims on appeal. They too could be said to have been omitted from the motion to vacate as a result of the incompetence of Clay's appointed counsel and thus "would not normally be expected to be included in a post trial motion." *Harrawood,* 66 Ill.App.3d at 167, 22 Ill.Dec. at 901, 383 N.E.2d at 709. *Accord, People v. Rhodes,* 71 Ill.App.2d 150, 151, 217 N.E.2d 123, 124 (4th Dist.1966) (counsel's failure to object to admissibility of evidence did not waive issue because that failure was allegedly caused by his incompetence).[16]

Moreover, nothing in the record before this Court indicates Elson was not retained in sufficient time to prepare such an appeal. As his filing of the March 10 amended motion to vacate confirms, Elson began representing Clay more than two weeks before expiration of the appeal period from denial of the original motion to vacate.[17]

*lark v. Wolff,* 699 F.2d 354 (7th Cir.1983). Waiver concepts come into play when the petitioner has already "exhausted" his state remedies by eschewing an earlier opportunity to secure state court review of a federal constitutional claim. Thus the doctrine should be distinguished from the exhaustion requirement of 28 U.S.C. § 2254(b). Though also grounded on comity considerations, the latter statutory mandate contemplates exhaustion of any *presently* available state remedies. *Perry v. Fairman,* 702 F.2d 119, 120 (7th Cir.1983).

14. This section of this opinion holds the failure of Clay's Assistant Public Defender counsel to present these issues to the trial court did not foreclose Elson from raising the same issues for the first time on appeal. For that reason the waiver implications of the *Friedman-Harris* lapse itself need not be assessed. Because the parties have nonetheless concentrated on that waiver issue, two general comments may be in order:

1. Clay may assert her former counsel's incompetence as cause for the failure to advance her claims at the state trial court level. *See Norris v. United States,* 687 F.2d 899, 903 (7th Cir.1982).

2. Clay did not waive that point by neglecting to present it on direct appeal. *Wainwright*'s waiver doctrine is confined to the underlying habeas claims and is inapplicable to arguments bearing only on the cause-prejudice inquiry.

15. Clay's charge of ineffective assistance on the motion to vacate cannot be regarded as a fourth habeas claim. If meritorious, that contention would not invalidate the delinquency adjudication (the only relief available in this habeas proceeding). Instead it would merely accord another hearing on the motion to vacate. By contrast, Clay's charge of incompetency at the admission hearing does implicate the delinquency finding itself and therefore qualifies as a habeas claim.

16. Nor would disposition of those two claims on appeal have breached the general rule against entertaining non-record matters. Both claims draw on the same factual matrix that bounds the ineffective assistance claim, resolution of which generally requires supplementation of the record. Consequently the "plain error" doctrine would permit an appellate court to view any new evidence introduced in support of the incompetent counsel claim as probative of the other two claims as well. *See People v. Baynes,* 88 Ill.2d 225, 231, 58 Ill.Dec. 819, 821–22, 430 N.E.2d 1070, 1072–73 (1981) (plain error doctrine stays application of waiver rule where record discloses error affecting defendant's substantial rights).

17. Admittedly Elson was unaware the original motion had been denied when he filed the amended motion. But Clay has made neither a showing nor even a claim Elson had not learned of the disposition of the original motion

■ Under the circumstances, then, Clay's failure to appeal deprived the state courts of an opportunity to evaluate Clay's habeas claims.[18] That procedural default is fatal to those claims unless *Wainwright's* conjunctive requirements of cause and prejudice are met. *United States ex rel. Spurlark v. Wolff,* 699 F.2d 354, 357–61 (7th Cir.1983) (extending *Wainwright's* cause-prejudice standard to failure-to-appeal cases).

■ As for the "cause" prong, Clay asserts she was not required to raise the issues on appeal because it would have been futile to do so.[19] In fact she argues law of the case principles compel this Court's acceptance of that contention, for the 1980 Seventh Circuit opinion that remanded the case to this Court held futility was a sufficient cause to suspend operation of the waiver doctrine, 631 F.2d 516, 523 (7th Cir. 1980):

> The State has argued that any infirmities in the level of advocacy petitioner received in conjunction with the motion to vacate were somehow cured by the fact that petitioner retained present counsel seven days before the expiration of the period allowed for appealing the denial of the motion. We do not agree. Under Illinois law, a motion to vacate a guilty plea is addressed to the discretion of the trial court, and an appellate court may not reverse the denial of the motion except upon a showing of an abuse of dis-

cretion. *People v. Walston,* 38 Ill.2d 39, 230 N.E.2d 233 (1967). Given the general grounds in the motion, and the fact that no argument was presented in the trial court, there would have been no basis on which the appellate court could have reversed. For the same reason, we reject the State's contention that the failure to take an appeal was a deliberate bypass of state remedies, which constituted a waiver for purposes of federal habeas relief.

Two considerations lead this Court to a different conclusion:

1. Law of the case does not operate here.

2. Under the present state of the law, waiver *does* bar Clay's claim.

Those issues will be treated in turn.

■ As for law of the case, later Seventh Circuit and Supreme Court pronouncements have jettisoned the waiver principles on which the just-quoted language rested:

1. That language analyzed the problem under the "deliberate bypass" standard of *Fay v. Noia,* 372 U.S. 391, 438, 83 S.Ct. 822, 848, 9 L.Ed.2d 837 (1963).

2. This year's decision in *Spurlark* requires application of *Wainwright's* cause-prejudice test in lieu of *Fay's* more forgiving "deliberate bypass" standard in determining whether a petitioner forfeits habeas relief by failing to take a direct appeal.

---

(or the fact it was incompetently presented) *before* the time for appeal from that disposition had elapsed (some two weeks after the filing of his amended motion). Clay's recently-filed Supp.Mem. at 3 appears to skirt the issue carefully. Now Elson has just asked leave to file a transcript of the March 16, 1978 hearing on the amended motion, to show denial of the original motion to vacate was not specifically mentioned. As that new motion points out, Elson had access to the Juvenile Court file once he substituted for Friedman March 16—and the half sheet in the Juvenile Court case specifically shows the original motion had been denied February 24, 1978. That put Elson on notice of the availability of the appeal remedy—and that availability, not the mistaken belief the amended motion would be heard de novo, is the critical fact. Elson's decision to pursue the amended motion really has the look of a strate-

gic decision, which cannot of course be the basis for a second-guess habeas petition.

18. That conclusion is not altered by Elson's untimely effort to present the habeas issues in an amended motion to vacate. Because the amended motion was rejected on purely procedural grounds, the state courts did not have the chance to address the substantive claims.

19. Illinois appellate courts apply a stringent abuse of discretion standard in reviewing a trial court's denial of a motion to vacate. Except for the inadequate representation issue (which was of course not presented to the trial court at all), Clay would not have surmounted that test on appeal from denial of her original motion. See the Court of Appeals' discussion on the prior appeal in this case, quoted later in this paragraph of the text.

3. *Engle,* 102 S.Ct. at 1572–73 teaches that a belief it will be futile to try to convince a state court to uphold a constitutional claim does not excuse the procedural default.[20]

Consequently this Court is free to reconsider the waiver issue in light of such subsequent legal developments.[21] *Morrow v. Dillard,* 580 F.2d 1284, 1294, 1297 (5th Cir.1978) (law of case doctrine did not preclude District Court from reconsidering issue previously decided by Court of Appeals, because intervening Supreme Court decision superseded basis of Court of Appeals' decision); cf. *Crane Co. v. American Standard, Inc.,* 603 F.2d 244, 248–49 (2d Cir.1979) (holding law of the case principles do not bind Court of Appeals to an earlier ruling undercut by a subsequent Supreme Court decision, but reserving judgment on whether a District Court is similarly unconstrained).

On the merits, the Illinois "abuse of discretion" doctrine holds that the trial court's rejection of issues *actually raised* (however incompetently) in a motion to vacate cannot be overturned except upon a showing of such abuse. That stringent standard of review would not have extended to any of Clay's habeas claims, which were never presented to the trial court at all. As already noted, an Illinois appellate court would have entertained those claims de novo because they concern either trial counsel's incompetence (at the admission hearing) or issues neglected as a result of counsel's incompetence (at the post-admission proceeding).[22] And, as *Spurlark* and *Engle* [23] together make plain, current waiver doctrine categorically rejects Clay's proffered justification for her failure to appeal. There was no "cause" in *Wainwright* terms. That procedural default therefore disqualifies Clay from seeking federal habeas relief.[24]

**20.** In fact *Engle,* 102 S.Ct. at 1573 n. 36 intimates the futility justification may not pass muster even under the "deliberate bypass" formulation:

In fact, the decision to withhold a known constitutional claim resembles the type of deliberate bypass condemned in *Fay v. Noia,* 372 U.S. 391 [83 S.Ct. 822, 9 L.Ed.2d 837] (1963). Since the cause and prejudice standard is more demanding than *Fay*'s deliberate bypass requirement, see *Sykes, supra,* 433 U.S. at 87 [97 S.Ct. at 2506], we are confident that perceived futility alone cannot constitute cause.

**21.** Law of the case constraints may also be inapposite for yet another reason. Our Court of Appeals' waiver analysis treated only Clay's contention that she received ineffective assistance in connection with her motion to vacate—and not her underlying habeas claims (which were not presented to the trial court because of the original counsel's incompetence).

**22.** Indeed, those issues concerning the involuntariness of Clay's guilty plea form the very core of the incompetence claim.

**23.** Clay claims the relevance of *Engle* here is somehow undercut by the post-*Engle* footnote in *Mattes v. Gagnon,* 700 F.2d 1096, 1098–99 n. 1 (7th Cir.1983). *Mattes* there held an appeal from an adverse post-conviction ruling would have been "futile and, therefore, unnecessary to establish exhaustion." Three factors effectively refute Clay's contention:

1. By definition *Mattes* cannot limit (though it may surely distinguish) *Engle*'s

sweeping rejection of the futility justification as "cause" in a *Wainwright*-type waiver inquiry.

2. Unlike the *Mattes* petitioner (who at least gave the state courts one opportunity to entertain his claim), Clay never presented her habeas claims to any state court. Clay thus deprived the State of "a fair *opportunity* to address the federal constitutional issue[s]," *Mattes,* 700 F.2d at 1098 n. 1, quoting *Toney v. Franzen,* 687 F.2d 1016, 1021 (7th Cir. 1982) (emphasis in original).

3. In *Mattes* the state trial court's denial of post-conviction relief (from which no appeal was taken) was based on a state Supreme Court decision squarely on point. By contrast, in the present case any belief by Clay's counsel in the futility of an appeal was grounded in a misperception of state law in that respect, together with the mistaken belief the amended motion to vacate would be heard de novo.

**24.** Focusing only on the ineffective assistance claim, Director attempts to establish lack of "cause" by imputing to Elson the procedural default committed in the course of the original motion to vacate. Essentially Director argues Elson could and should have ensured the presentation of that habeas claim by either advising Friedman of it or preparing the motion himself. Elson's supposed ability and obligation to do so rests on two factual premises:

1. Elson (as well as Friedman) served as Clay's counsel at the time of the motion to vacate.

### Conclusion

There is no genuine issue of material fact, and Director is entitled to judgment as a matter of law. Director's motion for summary judgment is granted.

2. Elson knew of Clay's ineffective assistance claim.

That argument is rejected, for it is both limited and flawed:

1. It does not at all implicate Clay's other two claims. Elson concededly notified Friedman of the involuntary plea claim. And there is no evidence as to Elson's awareness of the due process claim at that point.

2. Its factual predicates are disputed issues that cannot be resolved in Director's favor in this Rule 56 context.

3. Its underlying legal theory is also fundamentally defective. Regardless of Elson's status as Clay's co-counsel (sharply disputed), without question Friedman had the responsibility (communicated by Elson with Ina Clay's authorization) to present Clay's challenges in the motion to vacate. *Wainwright*'s cause inquiry must therefore focus on Friedman's failure to raise the habeas issues. If Friedman's incompetence occasioned those omissions, that constitutes just cause. Entitled to presume Friedman's competence, Elson could reasonably expect Friedman to detect and assert those grounds for relief on his own. Of course, had Elson known in advance that Friedman would not raise these habeas claims, Elson's unwillingness to assist Friedman might then reflect a decision to withhold a constitutional claim, precluding any finding of cause. But neither Director nor the present record ascribes such foreknowledge to Elson.