**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Mary Ann BILANZICH,**
**Defendant-Appellant.**

**No. 85–1083.**

United States Court of Appeals,
Seventh Circuit.

Argued June 6, 1985.

Decided Aug. 22, 1985.

provide evidence of or prove the truthfulness of his complaint.

Robert A. Korenkiewicz, Chicago, Ill., for defendant-appellant.

William R. Coulson, Asst. U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before CUMMINGS, Chief Judge, WOOD, Circuit Judge, and WRIGHT, Senior Circuit Judge.*

CUMMINGS, Chief Judge.

Defendant Mary Ann Bilanzich appeals from her conviction after a bench trial of one count of conspiracy to steal, forge and cash United States Treasury checks and Illinois Department of Public Aid checks in violation of 18 U.S.C. § 371, six counts of forging and cashing United States Treasury checks in violation of 18 U.S.C. § 495, and two counts of possession of United States Treasury checks stolen from the mail in violation of 18 U.S.C. § 1708.[1] Five other counts (7, 10, 11, 12 and 16) were dismissed without prejudice on the Government's motion because the parties were unable to stipulate the supporting evidence. The district court sentenced her to one year's imprisonment to be followed by a five-year term of probation. The defendant challenges the reasonableness of a search of her business office and the district court's denial of bail while she brings this appeal. We reject her arguments and affirm the lower court.

I

For the eighteen years prior to October 1984, the defendant was the manager of the Northmere Hotel in the Uptown area of Chicago, Illinois. The Northmere is "a privately owned residential hotel for elderly and disabled persons receiving payments from the United States Social Security Administration and the Illinois Department of Public Aid" (Stip. ¶ 1.d). Various social service agencies, such as the Illinois Department of Human Resources, refer individuals to the Northmere, where the staff provides them with food and shelter and with assistance in seeking medical treatment and financial support. The hotel is co-owned by Lino Iscra, who acquired his ownership interest in early 1982, and Joseph Ades.

In return for managing the Northmere, the defendant received a small salary and three rooms, Rooms 121, 122, and 123, to use as her personal residence. In addition to these rooms, the defendant maintained an office, Room 128, in which she kept the hotel's books and performed other managerial duties of the hotel. Prior to the spring of 1982, she had maintained this office in a different room off of the lobby in the front of the building. That office became Mr. Iscra's after he acquired his ownership interest, and Mrs. Iscra and Ms. Bilanzich moved her possessions to Room 128 and to a small office behind the switchboard that spring (Def.Br. 5).

Prior to October 1, 1982, a Secret Service case agent met with the Northmere's two owners, Messrs. Iscra and Ades. The case agent needed identification information—believed to be in the hotel's tenant files and medical records—pertaining to persons in whose names federal and state benefits checks were issued and mailed to the Northmere. The owners informed the agent that they were not certain themselves whether these named individuals or payees lived at the hotel, or even if they existed. They furnished the agent with a diagram of the first floor of the hotel, marking Rooms 121, 122, 123 and 124 as being Ms. Bilanzich's (Govt.App. 3).[2] Mr. Iscra's wife, Lucy Iscra, informed the Secret Service case agent that hotel records, including tenant and medical files, were kept in Room 128. Mr. Iscra signed a consent form authorizing a search of

the public areas, the management office, and those areas under hotel management control not currently leased or rented to private individuals at the Northmere Ho-

* The Honorable Eugene A. Wright, Senior Circuit Judge of the United States Court of Appeals for the Ninth Circuit, is sitting by designation.

1. She was indicted with co-defendant John J. Kennelly, who subsequently pleaded guilty.

2. Since defendant testified that only Rooms 121, 122 and 123 were exclusively hers, perhaps the diagram should not have shown Room 124 also to be hers.

tel, 4943 N. Kenmore, Chicago, Illinois. This authority is granted by me as the co-owner and co-operator of said hotel. My consent to search extends to all books, documents, ledgers and miscellaneous business documents which are the property of said hotel and which are maintained at the hotel. (Govt.App. 2.)

On October 1, 1982, two investigative agents, one from the Secret Service and one from the Illinois Department of Law Enforcement, entered the Northmere, identified themselves, and asked to speak with Ms. Bilanzich. She consented but asked them to wait while she finished working the switchboard. When she was free, she joined them in Mr. Iscra's office where she had asked them to wait for her. She voluntarily answered their questions during the interview which lasted for about forty-five minutes. When asked to identify which hotel rooms were hers, she identified Rooms 121, 122, and 123 as hers. At the conclusion of the interview, the agents informed her that twenty-five to thirty case workers and agents would be arriving at the hotel to identify and interview all tenants who were payees on government benefits checks, and they asked her not to interfere. Thereafter personnel from the Secret Service, U.S. Postal Service, Social Security, Illinois Department of Law Enforcement, and Illinois Department of Public Aid interviewed, photographed and fingerprinted those hotel residents who were recipients of federal and state benefits programs. This procedure was necessary to ascertain whether named payees were receiving their checks, and, if not, to determine who in fact was receiving and cashing them.

The door to Room 128 was kept locked; the defendant had the key. Mr. Iscra testified at a suppression hearing held October 22–23, 1984, that he did not have a key because he did not need one. If he wanted hotel records from Room 128, he requested Ms. Bilanzich to bring them to him. He was unaware of any records other than hotel business records and records regarding the welfare of the tenants being kept in Room 128. Two law enforcement agents searched Room 128 in the mid-afternoon of October 1, 1982, following the tenant interviews. Mr. Iscra unlocked the door for them, apparently with a key defendant had left at the switchboard. The agents seized various documents lying loose on top of the desk and records found in unlocked desk drawers and an unlocked file cabinet.

Before trial, Ms. Bilanzich moved to suppress documents and tangible objects seized during the search of Room 128. The district court denied her motion after a two-day hearing, ruling that Mr. Iscra, as the co-owner of the hotel, had authority to consent to the search of offices used for the operation and management of the hotel, rendering his consent valid. The lower court also ruled that Ms. Bilanzich had no reasonable expectation of privacy regarding Room 128 or its contents that would vitiate Mr. Iscra's consent.

Evidence introduced at a stipulated bench trial on nine counts in the indictment included seventy-four cancelled United States Treasury and Illinois Department of Public Aid checks bearing forged payee endorsements and Ms. Bilanzich's second endorsement, as well as an original check-cashing card filled out by Ms. Bilanzich at a local currency exchange. The defense was that the stipulation failed to establish her knowledge that certain checks she cashed were stolen from the mail or that she had an intent to defraud when she cashed them. The judge rejected this argument and convicted her of the nine counts that were the subject of the stipulation. None of the evidence seized from Room 128 was used at trial.[3] At sentencing on Janu-

---

**3.** The evidence seized contained information on only two of the individuals named in the indictment—a Christ DeBlasis and a Donald Percy Rice, both deceased. The defendant argues that the government returned a substantial number of documents to Mr. Iscra before the defense had a chance to see the evidence, that this evidence may have mentioned other individuals who were subjects of the indictment, and that therefore the government may have acquired its first information concerning these other individuals from the challenged search. The dis-

ary 11, 1985, the district judge stayed execution of the defendant's sentence for almost two months at her request. He also stated that he would grant bail pending appeal. She filed a timely notice of appeal, after which the government moved the trial court to revoke bond on appeal unless the defendant could meet the new criteria for bond established by the Bail Reform Act of 1984. Following a hearing on the issue on February 19, 1985, the district judge denied Bilanzich bail. We have jurisdiction pursuant to 28 U.S.C. § 1291.

## II

■ The Fourth Amendment protects individuals against "unreasonable searches and seizures." U.S. const. amend. IV. The Supreme Court has emphasized that "the essential purpose of the Fourth Amendment [is] to shield the citizen from unwarranted intrusions into his privacy." *Jones v. United States*, 357 U.S. 493, 497, 78 S.Ct. 1253, 1256, 2 L.Ed.2d 1514 (citations omitted). The core inquiry is whether a person has a reasonable expectation of privacy in the area searched. When police officers rely on consent in a situation where a warrant would otherwise be required, the consent must be voluntary. If the consent was given by a third party rather than by the defendant, the third party must be one "who possessed common

authority [with the defendant] over or other sufficient relationship to the premises or effects sought to be inspected." *United States v. Matlock*, 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (footnote omitted). Mr. Iscra, as co-owner of the hotel, had the requisite control over and relationship to a business office, Room 128, in which he directed one of his employees to conduct hotel business to enable him to give valid consent.

■ Ms. Bilanzich's contention that she had exclusive control over Room 128 lacks all evidentiary support.[4] Her being allowed to conduct hotel business without supervision by Mr. Iscra does not convert Room 128 from a business office over which the owner of the business has control into the employee's private domain. That he did not have his own key to the room is irrelevant, considering that he could request access from Ms. Bilanzich at any time. We agree with the government that the defendant "confuses office routine and practice with the concept of possessory rights giving rise to an expectation of privacy" (Govt.Br. at 17).

Room 128 served a variety of purposes at the Northmere. It was referred to as the doctor's office because the physicians and psychiatrists who came to the hotel to treat the residents used the room. Welfare case

---

trict court rejected her contention that the evidence seized contained information on anyone other than Rice and DeBlasis. The Secret Service case agent testified under oath at the suppression hearing that the information seized contained no information on any individuals named in the indictment except for DeBlasis and Rice.

The government's returning irrelevant miscellaneous material to Mr. Iscra without copying it does not in this case constitute misconduct. Nothing in the record supports the defendant's contention regarding the other individuals named in the indictment and we also reject it. The trial court described her argument as an attempt to use the suppression hearing to engage in discovery rather than to establish any well-grounded objection to the government's evidence. The government proved that it had independent knowledge of the defendant's forging and cashing DeBlasis' checks at least eighteen months prior to the October 1, 1982, search. The court granted the government's

motion to dismiss without prejudice those counts of the indictment relating to Rice, so that trial proceeded on only those counts relating to DeBlasis, about whom the government had prior independent information, and the counts relating to those individuals about whom the government had obtained no information from its search of Room 128.

4. Her contention that the trial court terminated the suppression hearing prematurely also lacks merit. The trial court allowed the hearing to continue two days, and even permitted Ms. Bilanzich to testify twice and examine additional witnesses, to ensure that she had had an adequate opportunity to establish a factual foundation for her allegations. The judge repeatedly asked her to address the problem of reasonable expectation of privacy and requested her to provide relevant case authority. We are impressed with his patience and forbearance in handling this matter.

workers also used the room to conduct interviews. It became Ms. Bilanzich's office as well only when the Iscras determined that they needed the room she had previously used for business. Therefore Mrs. Iscra and defendant "removed Ms. Bilanzich's things" (Def.Br. 5) to Room 128 without protest, an action reflecting the Iscras' authority over the files and records the defendant maintained. When asked which rooms were hers on October 1, 1982, Ms. Bilanzich responded that Rooms 121, 122, and 123 were hers. Thus the defendant herself appears to have conceded the point—that she had no expectation of privacy in Room 128.

The defendant quite rightly points out that the sole fact of ownership cannot confer on Mr. Iscra the authority to give consent, because the "authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements." *United States v. Matlock*, 415 U.S. at 171 n. 7, 94 S.Ct. at 993 n. 7 (citations omitted). The point the Supreme Court was making in *Matlock*, however, is that common-law property rights and the fact of ownership alone cannot defeat an individual's reasonable expectation of privacy, be the individual a tenant, a hotel guest, or another such type of person. But Mr. Iscra did not purport to give consent to search Ms. Bilanzich's three private rooms, in which she lived, but only to the office where she conducted hotel business at Mr. Iscra's direction. Although she did keep some personal items there, as many workers do, that practice "does not turn those premises into the private premises of the employee, to the exclusion of the rights of the owner of the premises" (Tr. 200, 10/23/84). The

documents taken were on top of the desk, in unlocked desk drawers and in an unlocked file cabinet. Consequently, this case did not involve the situation of the defendant's keeping items in a locked compartment to which the defendant might have had a legitimate expectation of privacy.

■■■ Our approval of the district court's refusal to suppress the evidence seized is hardly surprising. We simply hold that the owner of a business who exercises oversight authority over a management employee has the authority to consent to a search of the business' premises, including all employee offices, for records relating to the business.[5]

### III

Defendant also challenges the district court's denial of bail pending appeal. At issue is a provision of the Bail Reform Act of 1984, to be codified at 18 U.S.C. § 3143(b), as follows:

(b) Release or Detention Pending Appeal by the Defendant—

The judicial officer shall order that a person who has been found guilty of an offense and sentenced to a term of imprisonment, and who has filed an appeal or a petition for a writ of certiorari, be detained, unless the judicial officer finds—

(1) by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released pursuant to section 3142(b) or (c); and

(2) that the appeal is not for purpose of delay and raises a substantial ques-

---

**5.** Ms. Bilanzich argues that the medical and welfare records pertaining to Northmere residents were her personal records, not hotel business records. This argument is untenable. A symbiotic relationship exists between this sort of resident hotel and the public welfare system. The record establishes that social service agencies refer elderly and disabled individuals to the hotel. The staff there helps its residents to obtain the necessary public aid from the state and federal governments. Although the North-

mere is a hotel and not a government institution, it depends for its existence on its residents' obtaining the public aid moneys to which they are entitled and which they require if they are to be able to pay the hotel for their shelter and to continue to live there. The hotel authorized Ms. Bilanzich to assist the Northmere's residents in obtaining public aid, not from philanthropic motives but from profit motives—the residents' obtaining these benefits was vital to the hotel's continued operation.

tion of law or fact likely to result in reversal or an order for a new trial. If the judicial officer makes such findings, he shall order the release of the person in accordance with the provisions of section 3142(b) or (c).

In accordance with this statute, the district court found that the defendant was not likely to flee or pose a danger to the safety of any other person or to the community, but that her "proposed appeal * * * does not raise a substantial question of law or fact and is not likely to result in reversal or an order for a new trial" (Govt. App. 1). The defendant contends that this statute requires the district court to deteermine whether one of its rulings on a substantial question of law or fact is likely to result in a reversal of her conviction or an order for a new trial, and that as so applied the statute is unconstitutional. We disagree.

The new statute reverses the prior presumption in the Bail Reform Act of 1966 that, provided one or more conditions of relief could reasonably assure that a defendant will not flee or pose a danger to the safety of any other person or the community, a convicted defendant would be entitled to bail unless "it appears that an appeal is frivolous or taken for delay." § 3(a), 80 Stat. 214, 215–216 (formerly codified as 18 U.S.C. § 3148). The change Congress enacted "requires an affirmative finding that the chance for reversal is substantial. This gives recognition to the basic principle that a conviction is presumed to be correct." S.Rep. No. 225, 98th Cong., 1st Sess. 27, reprinted in 1984 U.S.Code Cong. & Ad.News 3182, 3210. The new statute also requires the defendant, not the government, to shoulder "the burden of showing the merit of the appeal." *Id.* at 27 n. 86, 1984 U.S.Code Cong. & Ad.News 3182, 3210 n. 86.

Six other circuits have considered the precise issue before us today. See *United States v. Affleck,* 765 F.2d 944 (10th Cir.1985) (*en banc*); *United States v. Handy,* 761 F.2d 1279 (9th Cir.1985); *United States v. Powell,* 761 F.2d 1227 (8th Cir.1985) (*en banc*); *United States v. Valera-Elizondo,* 761 F.2d 1020 (5th Cir.1985); *United States v. Giancola,* 754 F.2d 898 (11th Cir.1985) (*per curiam*); *United States v. Miller,* 753 F.2d 19 (3d Cir.1985). Each has followed the two-step interpretation pioneered by the Third Circuit in *Miller,* an approach that we also adopt. In determining whether a convicted defendant is entitled to bail pending appeal, the district court, once it has found that clear and convincing evidence establishes that the defendant is not likely to flee or pose a danger to any other person or to the community if released, must first determine whether the appeal presents a substantial question of law or fact. Second, the district court must determine whether, assuming that the question is decided in the defendant's favor, the appellate court is more likely than not to reverse the conviction or order a new trial on all counts for which imprisonment has been imposed.[6]

We have previously defined a substantial question as one that " 'is a "close" question or one that very well could be decided the other way.' " *United States v. Molt,* 758 F.2d 1198, 1200 (1985) (quoting *United States v. Giancola,* 754 F.2d at 901). This formulation differs somewhat from the one adopted by the Third Circuit in *Miller,* which defined a substantial question as "one which is either novel, which has not been decided by controlling precedent, or which is fairly doubtful." 753 F.2d at 23. While in general we find the Third Circuit's formulation helpful, we think the Eleventh Circuit's comments in *Giancola* are very

---

6. The substantial question must be one that would result in reversal or a new trial on all counts for which the defendant has been sentenced to prison. Otherwise, "the reason for allowing bail on appeal, that a defendant should not be imprisoned under a legally erroneous sentence, disappears." *United States v. Powell,* 761 F.2d at 1233.

We want to make clear that insofar as the inquiry into whether a question is substantial and is likely to result in reversal or a new trial if decided favorably to the defendant requires an examination of the merits, any such examination made prior to full consideration and briefing on the merits does not bind the subsequent panel that considers the merits fully.

persuasive. The Eleventh Circuit pointed out that a question might be novel or without controlling precedent but so obviously wrong that no court previously has had to address the question. Alternatively no precedent might exist in this Circuit, but a question would still not be likely to result in reversal or an order for a new trial because no real reason exists to suggest that this Circuit would depart from the unanimous resolution of the issue by other circuits. See *Giancola*, 754 F.2d at 901. Asking whether the question is a close one accords fully with Congressional intent that the conviction be presumed correct. Of course the phrase "substantial question" is not capable of precise definition but must be left to a case-by-case determination. See *United States v. Powell*, 761 F.2d at 1232; *Giancola*, 754 F.2d at 901.

The phrase "likely to result in reversal or an order for a new trial" requires the district court to determine whether the substantial question

> is so integral to the merits that it is more probable than not that reversal or a new trial will occur if the question is decided in the defendant's favor. In deciding whether this part of the burden has been satisfied, the court or judge to whom application for bail is made must assume that the substantial question presented will go the other way on appeal and then assess the impact of such assumed error on the conviction.

*United States v. Powell*, 761 F.2d at 1234. For example, harmless errors, errors that have no prejudicial effect, or errors that have been insufficiently preserved would not justify a court's granting bail. See *Miller*, 753 F.2d at 23. As so interpreted, the language "must be read as going to the significance of the substantial issue to the ultimate disposition of the appeal." *Id.* This interpretation affords to the word "likely" its ordinary meaning of more probably than not. See *Powell*, 761 F.2d at 1233; *Valera-Elizondo*, 761 F.2d at 1024–1025. Thus whether a question is " 'substantial' defines the *level of merit* required in the question presented and 'likely to result in reversal or an order for a new

trial' defines the *type of question* that must be presented." *Handy*, 761 F.2d at 1280 (emphasis in original).

We interpret this language in this manner for two reasons. First, were we to ask the trial court to determine whether one of its own rulings was likely to be reversed, the word "substantial" would be rendered redundant. The statute could simply have read that the appeal "raises a question of law or fact likely to result in reversal or an order for a new trial." When possible this Court will avoid interpreting statutes to contain needless repetition. Second, requiring district judges to determine the likelihood of their own error is repugnant, for in such a case the proper remedy would be to rectify the error on post-trial motions. "Judges do not knowingly leave substantial errors uncorrected, or deliberately misconstrue applicable precedent. Thus, it would have been capricious of Congress to have conditioned bail only on the willingness of a trial judge to certify his or her own error." *Miller*, 753 F.2d at 23. Moreover, the defendant urges the subjective interpretation of the statute in order to buttress her arguments that the statute is unconstitutional. When two interpretations of a statute are equally possible, a court would be remiss to reject the reading of the statute that is on firmer constitutional ground. See *United States v. Powell*, 761 F.2d at 1238 (Lay, C.J., concurring).

 Defendant's constitutional arguments are unavailing. We have already determined that the statute does not violate the Ex Post Facto clause. *United States v. Molt, supra.* Nor does it violate the prohibition on excessive bail contained in the Eighth Amendment. The right to bail is not an absolute one, and Congress may restrict the category of cases in which bail will be allowed. *Carlson v. Landon*, 342 U.S. 524, 545–546, 72 S.Ct. 525, 536–537, 96 L.Ed. 547. The District of Columbia Court of Appeals, after examining the history of the excessive bail clause, determined that "the primary purpose is to limit the judiciary," not the power of Congress. *United*

States v. Edwards, 430 A.2d 1321, 1330 (D.C.Ct.App.1981) (en banc), certiorari denied, 455 U.S. 1022, 102 S.Ct. 1721, 72 L.Ed.2d 141. The situation at bar does not implicate a denial of bail before trial and conviction, see Stack v. Boyle, 342 U.S. 1, 72 S.Ct. 1, 96 L.Ed. 1, but a denial of bail after a court or a jury has determined that the defendant has been proven guilty beyond a reasonable doubt. The rate of reversal of district court decisions is extremely low, so that Congress' making bail more difficult to obtain once an individual has been found guilty is not unreasonable, nor is it impermissible under the Eighth Amendment.

■■■ Doing so does not violate the Fifth Amendment either. The court's separate determination of whether the defendant can satisfy the new conditions for bail affords to the defendant adequate due process of law. We note that Fed.R.App.P. 9(b) requires the court of appeal, in a case in which an appeal is pending and the district court has denied bail, to review promptly the lower court's denial of bail. Consequently a defendant need not await a full hearing on the merits before obtaining review of the bail decision. The possibility that an individual would serve out his term of imprisonment and then have his conviction reversed is not large. Even if some such cases might arise, the statute as written provides adequate procedural safeguards.

■■■ In the case at bar, the district court correctly determined that bail was inappropriate. The evidence introduced at the suppression hearing and Fourth Amendment jurisprudence amply support the trial court's determination that Mr. Iscra as co-owner of the Northmere had sufficient authority over Room 128 to authorize its search, and that the search did not violate any reasonable expectation of privacy held by Ms. Bilanzich. Consequently, defendant was unable to demonstrate that her appeal presented a substantial question of law or fact. Nor could she demonstrate that, assuming the question of consent was decided in her favor, her conviction would be reversed. None of the evidence seized was used at trial. Moreover, the only item obtained by the government in the search that referred to an individual who was the subject of one of the counts of the indictment on which she was tried was an individual who had been known to the Secret Service for at least eighteen months prior to the search. Since the evidence was discovered independently of the challenged search, it cannot be suppressed. Because Ms. Bilanzich failed to establish that she met either of the criteria required by 18 U.S.C. § 3143(b)(2), the district court's denial of bail was correct. Her conviction and the denial of bail are affirmed.