STATE of Utah, Plaintiff and Appellee,

v.

Donald Wayne BROWN, Defendant
and Appellant.

No. 900148.

Supreme Court of Utah.

Nov. 30, 1992.

Rehearing Denied June 17, 1993.

R. Paul Van Dam, David B. Thompson, Salt Lake City, for plaintiff and appellee.

Nathan D. Hult, Logan, for defendant and appellant.

DURHAM, Justice:

Defendant Donald Wayne Brown and three other men were charged in the beating death of Miguel Ramirez at the Western Brine Shrimp harvesting camp. Brown appeals his convictions of second degree murder, a first degree felony, under Utah Code Ann. § 76–5–203, and aggravated assault, a third degree felony, under Utah Code Ann. § 76–5–103. We reverse and remand for a new trial because of defense counsel's conflict of interest. We also address other issues that may be relevant to the new trial.

In October 1989, Brown and eight other employees were in the Western Brine Shrimp Company's camp on the northwest-

ern shore of the Great Salt Lake. Brown and three other men were drinking in one of the four trailers located at the camp. The four men asked Eddie Apodaca, an employee who resided in a different trailer, to come over. A brief scuffle ensued, after which Apodaca returned to his trailer. The four men followed Apodaca, confronted Miguel Ramirez, Apodaca's roommate, forced Ramirez outside, and beat him. Ramirez died several hours later from the injuries he sustained during the beating.

The next morning, the police arrived, secured the premises, and conducted two warrantless searches of the Western Brine Shrimp trailer in which Brown resided. Brown, Billy Cayer, Ray Cabututan, and William Cummins were charged with Ramirez's death. Brown was convicted and now appeals his conviction.

Among the issues Brown raised on appeal are the following: (1) whether the trial court properly admitted evidence seized without a warrant; (2) whether it was appropriate for a part-time city attorney to represent Brown as appointed counsel; (3) whether the trial court erred in admitting evidence of Brown's prior bad acts; (4) whether the evidence sufficiently supported Brown's conviction of aggravated assault; (5) whether the prosecutor's reference to Brown as a "mad dog" in closing argument was unduly prejudicial; (6) whether the trial court abused its discretion in giving an *Allen*-type instruction to the jury; and (7) whether it was appropriate for the trial court to assess defense costs to Brown as part of his sentence. Brown also raised other issues, but because we remand due to defense counsel's conflict of interest and because they will not be relevant to the new trial, we do not address them.

## WAIVER/PROCEDURAL DEFAULT STANDARD

■ Defendant raises several of his issues for the first time on appeal. Despite his failure to preserve these issues below, he argues that we should reach the merits of his claims under a "liberty interest" exception noted by this court in *State v.*

*Breckenridge*, 688 P.2d 440, 443 (Utah 1983).

In *Breckenridge*, the defendant raised a due process claim for the first time on appeal. The defendant, who worked at a bodyshop, was charged with arson. During a "confession," he stated that he had decided to dispose of a pile of car parts that had accumulated in the corner of the building by burning them with a paint gun and cutting torch. The fire spread out of control and damaged the building. *Id.* at 442. Without any factual basis indicating that the defendant *intentionally damaged* the building, the trial court accepted his plea of guilty to a charge of arson under Utah Code Ann. § 76-6-102. On appeal, Breckenridge argued that his right to due process was violated because the court accepted his guilty plea "without his understanding the nature and elements of arson and without a showing that there was any factual basis upon which to base conviction of a crime." *Breckenridge* at 443. We agreed that his right to due process was substantially affected. *Id.* at 444.

Rule 103(d) of the Utah Rules of Evidence provides that we may take notice of "plain error" that affects the "substantial rights" of a party even though the error was not brought to the attention of the court. In *State v. Eldredge*, 773 P.2d 29 (Utah), *cert. denied*, 493 U.S. 814, 110 S.Ct. 62, 107 L.Ed.2d 29 (1989), we described the two requirements for finding "plain error." First, from our review of the record we must determine that it should have been obvious to a trial court that it was committing error. Second, the error must be harmful in that it affects the substantial rights of the accused. *See id.* at 35 and cases cited therein. In *Breckenridge*, this court commented, "The general rule that constitutional issues not raised at trial cannot be raised on appeal is excepted to when a person's liberty is at stake." 688 P.2d at 443. We acknowledge that this language, although only an incidental comment in a case with clear plain error and obvious constitutional ramifications, has resulted in some confusion regarding the waiver/procedural default rule. *See State v. Jame-*

*son,* 800 P.2d 798, 802–03 (Utah 1990); *State v. Harrison,* 805 P.2d 769, 779 n. 13 (Utah Ct.App.), *cert. denied,* 817 P.2d 327 (1991); *State v. Hargraves,* 806 P.2d 228, 231–32 (Utah Ct.App.1991). *Breckenridge* was a case of plain error in which the *Eldredge* standard was clearly met. We did not intend in *Breckenridge* to carve out an additional exception to our traditional plain error standard, and we now expressly disavow any implications to that effect. We therefore review the issues raised in this case for the first time on appeal using the plain error standard.

## WARRANTLESS SEARCH

■ At the hearing on defendant's motion to suppress evidence, the parties presented the following details surrounding the search. On October 26, 1989, three officers of the Box Elder County Sheriff's Department responded to a reported assault at the Western Brine Shrimp camp. The officers arrived at the scene and arrested defendant, Cummins, Cayer, and Cabututan. All four suspects were placed in trailer 4 (the trailers were numerically designated for clarity at trial). The officers entered trailer 3, the trailer in which defendant and the other suspects slept, on several occasions. First, shortly after their arrival, the officers did a quick search for safety reasons to locate additional suspects or weapons. After this search, one officer propped open the door to trailer 3. Second, the officers entered at the arrested defendants' request to retrieve a pack of cigarettes. The officers could not find the cor-

rect brand of cigarettes and entered again when defendants gave more specific instructions as to the location of the cigarettes. The officers entered a fourth time to obtain medication for defendant Cayer. Officer Yeates testified that on these trips into the trailer, he saw a box, wet shoes, and a wet wrench.

■ Approximately two hours after defendants were transported to the jail, the officers talked to the owner and property manager of Western Brine Shrimp by radio and obtained permission to search all of the trailers. Yeates entered trailer 3 and seized, among other things, a pink bag containing Brown's wet clothes. Yeates saw Brown's knife on his bunk but did not seize it until the following day. The question presented is whether the seizure of these articles was permissible under the Fourth Amendment to the United States Constitution.[1]

At the suppression hearing, the trial court ruled that the search was permissible for the following reasons: (1) it was incident to an arrest; (2) there were exigent circumstances, namely, isolation and distance, a homicide, possible dissipation of blood, access of other employees to the premises, rain and snow nearby, and a great deal of agitation and distress on the part of camp personnel; (3) the items seized were in plain view; and (4) the owner consented. We review the factual findings underlying the trial court's decision to grant or deny a motion to suppress evidence using a clearly erroneous standard.

---

**1.** In his opening brief, Brown stated that seizure of his clothes and folding knife "should have been suppressed under either the state or federal constitutions." The State correctly noted that Brown's analysis of the search and seizure issue proceeded under Fourth Amendment law with no effort to analyze the question under article I, section 14 of the Utah Constitution. The State responded, therefore, by discussing only federal law. The State cites *State v. Lafferty,* 749 P.2d 1239, 1247 n. 5 (Utah 1988), *aff'd,* 776 P.2d 631 (Utah 1989), *vacated on other grounds sub nom. Lafferty v. Cook,* 949 F.2d 1546 (10th Cir.1991), where we stated the general rule that "we will not engage in a state constitutional analysis unless an argument for different analyses under the state and federal constitutions is briefed."

In his response brief, Brown obviously realized his failure to include a state constitutional analysis and asserted this entirely new argument. If we were to review Brown's state constitutional analysis under those circumstances, he would be rewarded for his omission and given the opportunity to present an unopposed analysis. The State would be placed in the difficult position in future cases of either missing the opportunity to brief the state constitutional law issue or having to construct and then rebut the unbriefed issue. We prefer to review state constitutional law issues that both parties have had an opportunity to brief. Brown was aware that a state constitutional law claim might be useful to him when filing his opening brief. Because he did not analyze that issue at that time, we will not review it.

We review the trial court's conclusions of law based on these facts under a correctness standard. *State v. Ramirez*, 817 P.2d 774, 781–82 (Utah 1991). The State concedes that the search incident to arrest and exigent circumstances exceptions are inadequate and relies only on the consent and plain view exceptions as justifying the search.

▪ The Fourth Amendment prohibits all unreasonable searches and seizures. *Katz v. United States*, 389 U.S. 347, 353, 88 S.Ct. 507, 512, 19 L.Ed.2d 576 (1967). Warrantless searches are per se unreasonable unless undertaken pursuant to a recognized exception to the warrant requirement. *Id.* at 357, 88 S.Ct. at 514. Recognized exceptions include consent searches, *Washington v. Chrisman*, 455 U.S. 1, 102 S.Ct. 812, 70 L.Ed.2d 778 (1982); searches and seizures incident to lawful arrest based on probable cause under exigent circumstances, *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685, *reh'g denied*, 396 U.S. 869, 90 S.Ct. 36, 24 L.Ed.2d 124 (1969); searches and seizures made in hot pursuit, *Warden v. Hayden*, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967); searches and seizures of contraband in areas lawfully accessible to the public, *State v. Shreve*, 667 P.2d 590 (Utah 1983); and seizure of evidence in plain view after lawful intrusion, *State v. Harris*, 671 P.2d 175 (Utah 1983).

▪ The core inquiry in a Fourth Amendment analysis is "whether a person has a reasonable expectation of privacy in the area searched." *United States v. Bilanzich*, 771 F.2d 292, 296 (7th Cir.1985). "[I]t is the right of possession rather than the right of ownership which ordinarily determines who may consent to a police search of a particular place." 3 Wayne R. LaFave, *Search and Seizure* § 8.5(b) (2d ed. 1987). If a third party rather than the defendant consents to a search, the third party must be one who possesses "common authority" over the area or has some other "sufficient relationship to the premises or effects sought to be inspected." *Id.* § 8.5(c) (citing *United States v. Matlock*, 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39

L.Ed.2d 242 (1974)). The State argues that the owner of the facility had common authority with defendant and the other residents of the camp over at least the common areas of trailer 3. The State bears the burden of proving common authority, and it must do so by a preponderance of the evidence. *Matlock*, 415 U.S. at 177, 178 n. 14, 94 S.Ct. at 996, 996 n. 14 ("[T]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence.").

Brown shared trailer 3 with two other employees of the camp. He slept and kept his personal belongings in trailer 3. Anderson, an employee of the camp, testified that it was common practice for the men to knock before entering trailers other than their own. Trailer 3 was used to store the ground radios and a large refrigerator that held all of the perishable food for the camp. Anderson testified that usually the men would knock and Brown or the other co-tenants of trailer 3 would hand the food out to them. Anderson also stated that the men rarely entered someone else's trailer if the employee residing there was away.

The State argues that because Brown's trailer housed the ground radios and the camp refrigerator, that trailer was a "common area" over which the owner of the camp had authority to consent to a search. The trial court agreed with that analysis. In what amounted to its findings of fact and conclusions of law, the trial court rejected the notion that defendant was a tenant:

I think the testimony is that people came and went, the[y] shared, they had company things stored in those areas that they from time to time cooked for each other. And I don't think that the owner can give as much consent as he thinks he can. And that is, to go to anything that's located on that premises, I don't share that view. But I do think he can give consent to go into the common areas of the trailers and other things that he owns or controls there. Everybody else could. And certainly he could as well. And he can give consent for others to do

that in my judgment, which I think allows him to get to that point.

The record adequately supports the conclusion that trailer 3 had a "common area" used by all those working at the camp. In effect, the employer provided room and board for workers at the camp. The employer purchased the food for those who lived in the compound. Trailer 3 had a refrigerator and was the primary location for the storage of perishable food. Those who lived at the camp had the right to obtain food located in trailer 3, even though they lived in other trailers. The door to trailer 3 was never locked. Furthermore, the ground radios, which were critical to conducting the work of the camp, were stored in trailer 3 and accessible to everyone. No one disputes that every employee was free to enter trailer 3 at any time to obtain food or a radio. The same access was clearly available to the owner of the property, who gave the officers permission to search trailer 3.

It is of no consequence that employees who bunked in other trailers generally knocked when they wished to obtain food from the refrigerator. The act of knocking hardly delineates the constitutional limits of the right of privacy. Knocking prior to entry was merely a courtesy usually extended by those entering the trailer.

As an owner and operator of the business, Bentzley had an unrestricted right of access to at least the common area in trailer 3, and he therefore had the right to grant the officers authority to enter that area. *United States v. Bilanzich*, 771 F.2d 292, 296–97 (7th Cir.1985); *Donovan v. A.A. Beiro Constr. Co.*, 746 F.2d 894, 898–900 (D.C.Cir.1984); *State v. Kendrick*, 736 P.2d 1079, 1086 (Wash.Ct.App.1987). Based on that authorization, the officers' entry into that area was lawful. From the common area, all the items seized were in plain sight. None were hidden. None were in an area within the trailer in the sole possession of defendant, such as in a drawer, sleeping bag, container, or foot-locker.

It is also significant that Brown and his companion asked the officers three times to enter the trailer to retrieve cigarettes and medicine from their private belongings. Those entries were authorized, and defendant does not claim otherwise. Nevertheless, even though the officers had defendant's consent to search only his personal belongings those three times, whatever expectation of privacy defendant had in the trailer did not extend to the common area. Clearly, Bentzley's consent to search extended to the common area, and the officers who conducted the "plain view" search were justified in concluding that Bentzley did have authority under the doctrine set out in *Illinois v. Rodriquez*, 497 U.S. 177, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990), to consent to the search of the common area. We conclude that the trial court did not err in ruling that Bentzley had authority to consent to the search of trailer 3.

## DEFENSE COUNSEL'S STATUS AS PART-TIME CITY PROSECUTOR

▄▄▄ Brown contends that he was denied due process and the effective assistance of counsel when the court appointed Thomas Willmore as his trial counsel.[2] Brown claims that Willmore's employment as a part-time prosecutor for the city of Tremonton[3] while he was representing Brown constituted an inherent conflict of interest requiring reversal. Although we do not decide whether it is *constitutionally* impermissible to appoint a city attorney with prosecutorial responsibilities to represent an indigent defendant, we conclude that vital interests of the criminal justice

---

2. The State argues that Brown waived this objection because he did not raise it before the trial court. There is no evidence in the record that Brown knew of Willmore's status as a city prosecutor. Although there was some mention in the record of the jury voir dire that Willmore had prosecuted a relative of one of the jurors the year before, there was no mention that Willmore was currently a city prosecutor. Because Brown did not know of Willmore's status, he could not have raised the issue below. Consequently, he is not precluded from raising it here.

3. Brown was tried in Brigham City, Utah. Both Brigham City and Tremonton are in Box Elder County.

system are jeopardized when a city prosecutor is appointed to assist in the defense of an accused. Consequently, we hold that as a matter of public policy and pursuant to our inherent supervisory power over the courts, as well as our express power to govern the practice of law, counsel with concurrent prosecutorial obligations may not be appointed to defend indigent persons; therefore, we reverse defendant's conviction and order a new trial. *See* Utah Const. art. VIII, § 4; *State v. Florez*, 777 P.2d 452, 458 (Utah 1989) (noting our inherent supervisory power); *State v. James*, 767 P.2d 549, 557 (Utah 1989) (same); *State v. Bishop*, 753 P.2d 439, 499 (Utah 1988) (Zimmerman, J., concurring in the result) (same); *State in re Clatterbuck*, 700 P.2d 1076, 1081 (Utah 1985) (same).

The Utah criminal code requires that counties, cities, and towns providing counsel for indigent defendants "[a]ssure undivided loyalty of defense counsel to the client." Utah Code Ann § 77–32–1(4); *see also Glasser v. United States*, 315 U.S. 60, 75–76, 62 S.Ct. 457, 467, 86 L.Ed. 680 (defendant is entitled to the undivided loyalty of counsel), *reh'g denied sub nom. Kretske v. United States & Roth v. United States*, 315 U.S. 827, 62 S.Ct. 637, 86 L.Ed. 1222 (1942).[4] This loyalty is compromised when an attorney with prosecutorial responsibilities represents an indigent defendant. This divided loyalty is evident in several facets of representation. For example, city police officers are often primary witnesses for the prosecution. If those same police officers are called to testify in a case a city attorney is defending, the city attorney may be disinclined to vigorously and abrasively cross-examine these witnesses because such conduct might compromise cooperation in future prosecutions. Counsel may be similarly reluctant to strongly attack inappropriate police conduct. *See People v. Rhodes*, 12 Cal.3d 180, 115 Cal.Rptr. 235, 237, 524 P.2d 363, 365 (1974). The California Supreme Court has commented on the difficult situation counsel faces in such cases:

> In the situation confronting a city attorney acting as a defense counsel there inevitably will arise a struggle between, on the one hand, counsel's obligation to represent his client to the best of his ability and, on the other hand, a public prosecutor's natural inclination not to anger the very individuals whose assistance he relies upon in carrying out his prosecutorial responsibilities. Such a conflict of interest would operate to deprive a criminal defendant of the undivided loyal-

---

**4.** The Utah Rules of Professional Conduct also address this issue. An underlying premise of the rules is that a client is entitled to the undivided loyalty of counsel. Rule 1.7 provides:

> (a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:
> (1) The lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and
> (2) Each client consents after consultation.
> . . . .
> (c) A lawyer shall not simultaneously represent the interests of adverse parties in separate matters, unless:
> (1) The lawyer reasonably believes the representation of each will not be adversely affected; and
> (2) Each client consents after consultation.

Utah Rules of Professional Conduct 1.7 (1992). The comments to this rule further state: "[A] lawyer ordinarily may not act as advocate against a person the lawyer represents in some other matter, even if it is wholly unrelated." Because these rules do not govern our decision in this appeal, we do not undertake an analysis under them. Nevertheless, we note that the rules establish the general impropriety of an attorney representing separate clients with adverse interests. In the instant case, counsel's obligations to represent both the State and defendant violate this principle. *See Howerton v. State*, 640 P.2d 566, 567 (Okla.Crim.App.1982) ("A public prosecutor has as his client the state. It is obvious, therefore, that he cannot appear for any defendant in cases in which the state is an adverse party....") (citing ABA Comm. on Professional Ethics and Grievances, Formal Op. 142 (1935)).

Additionally, the legislature has recognized the inherent conflict involved when a prosecutor acts as defense counsel. Utah Code Ann. § 17–18–1(9)(a) (Supp.1992) provides:

> A county attorney may not:
> (a) in any manner consult, advise, counsel, or defend within this state any person charged with any crime, misdemeanor, or breach or any penal statute or ordinance[.]

Although this statute on its face prohibits only county prosecutors from acting as defense counsel, it reflects legislative disapproval of the notion of dual representation generally.

ty of defense counsel to which he is entitled.

*Id.* 115 Cal.Rptr. at 238, 524 P.2d at 366; *see also Karlin v. State,* 47 Wis.2d 452, 177 N.W.2d 318, 321 (1970) ("[T]he temptation might well arise not to be too hard on a police witness who is against your client today but would be the star witness for your prosecution tomorrow.").

Similarly, counsel may hesitate to attack the constitutionality of laws he or she has sworn to uphold as a prosecutor. *See Howerton,* 640 P.2d at 567. Counsel "may be loath to take a position as defense counsel which he would find embarrassing as Commonwealth's Attorney." *Goodson v. Peyton,* 351 F.2d 905, 908 (4th Cir.1965).

Furthermore, although counsel almost certainly intends to diligently represent the defendant's interests, it is impossible to determine what sort of unconscious influences may affect such advocacy. *See People v. Pendleton,* 52 Ill.App.3d 241, 9 Ill. Dec. 762, 766–67, 367 N.E.2d 196, 200–01 (1977) ("[W]hen matters of judgment and trial tactics are made in the name of the accused by an attorney with such concurrent commitments, even the most loyal and resolute defense attorney might be unable to conclusively establish the propriety of his actions."), *cert. denied,* 435 U.S. 956, 98 S.Ct. 1590, 55 L.Ed.2d 809 (1978). Lawyers who simultaneously represent an indigent defendant and the state are bound to be influenced at some level by loyalties required of a state's attorney. *See id.* Such influences, whether consciously perceived or not, jeopardize the integrity of the criminal adjudication process.

Finally, a defendant's interests may be compromised because of a natural hesitation to confide fully in a prosecutor. The defendant may have information regarding other crimes that he or she would not want a prosecutor to know. *See Goodson,* 351 F.2d at 909. Defendants should not feel constrained from discussing openly all aspects of their cases with counsel. Instead, they should feel fully protected from any potential abuses of confidence. *See People v. Shinkle,* 51 N.Y.2d 417, 434 N.Y.S.2d 918, 415 N.E.2d 909 (1980). For these rea-sons, it can never be in a defendant's best interests to be represented by counsel with prosecutorial obligations.

Additionally, dual representation erodes public confidence in the criminal justice system. To ensure faith in the impartiality and integrity of the justice system, the appearance of fairness and impartiality in the adjudication process must be diligently maintained. An unavoidable appearance of impropriety is created when a prosecutor assists in the defense of an accused. The public may perceive that a prosecutor, desiring to further his or her own professional career, may use connections and influence to obtain a favorable result for the defendant. *Rhodes,* 115 Cal.Rptr. at 239, 524 P.2d at 367. Or one may infer that a prosecutor will not jeopardize a "law and order" reputation by utilizing vigorous defense tactics.

The public may be further concerned that a prosecutor's vigorous defense of an accused will result in decreased support from law enforcement in future cases. A prosecutor who alienates those law enforcement agencies on which he or she depends for assistance in the prosecution of crimes may compromise his or her prosecutorial responsibilities. Thus, even if an individual defendant's interests were not actually jeopardized in a specific case, the risks to the integrity of the criminal justice system itself militate against appointing prosecutors to represent indigent defendants. *See id.* 115 Cal.Rptr. at 238, 524 P.2d at 366.

Finally, avoiding criminal defense representation is ultimately in the best interest of prosecutors. Regardless of his or her diligence in the representation, the inherent conflicts of the situation expose counsel to charges that the representation was not entirely faithful. *See People v. Stoval,* 40 Ill.2d 109, 239 N.E.2d 441, 444 (1968).

Thus, it is clear that conflicts of interest inhere whenever a city prosecutor is appointed to represent an indigent defendant. Although Chief Justice Hall points out that Brown was charged with violations of state law, *see* Utah Code Ann. § 76–5–203 (second degree murder), Utah Code Ann. § 76–5–103 (aggravated assault), and his ap-

pointed counsel's prosecutorial responsibilities were limited to matters of municipal law, this distinction is immaterial to the disposition of this case. A city is merely an ancillary unit of state government. *See Waller v. Florida*, 397 U.S. 387, 392, 90 S.Ct. 1184, 1187, 25 L.Ed.2d 435 (1970) (cities are merely "subordinate governmental instrumentalities created by the State to assist in the carrying out of state governmental function" (citation omitted)). Both city and state prosecutors deal interchangeably with all types of law enforcement personnel. City police officers are often called to testify in prosecutions of state law. *See, e.g., People v. Washington*, 101 Ill.2d 104, 77 Ill.Dec. 770, 772, 461 N.E.2d 393, 395 (1984) (city police officers were key witnesses in defendant's trial of state violation). Furthermore, city prosecutors, as representatives of the state, share the same loyalties as state prosecutors. In sum, all of the considerations outlined above apply whenever a prosecutor is appointed to represent a defendant, regardless of whether the defendant is charged with a violation of state or municipal law. Several states have so held. *See, e.g., Rhodes*, 115 Cal.Rptr. at 237, 524 P.2d at 365 (city attorney representing defendant charged with violation of state law disqualified); *Karlin v. State*, 47 Wis.2d 452, 177 N.W.2d 318, 321 (1970) (noting the "potential for a serious conflict when the legal representative of one subdivision of a state defends a person charged with a crime by another subdivision of the state").

Consequently, we hold that defendant's right to the undivided loyalty of counsel was jeopardized. Because a concrete showing of prejudice would be very difficult to make when a prosecutor is appointed to assist in the defense of an accused, we conclude that it is unnecessary and ill-advised to pursue a case-by-case inquiry to weigh actual prejudice. Instead, we announce a per se rule of reversal wherever such dual representation is undertaken so as to prevent its recurrence.

## PRIOR BAD ACTS EVIDENCE

■ While conducting cross-examination himself, Brown asked one of the State's witnesses if he had ever seen Brown acting in a confrontational manner. The witness responded that Brown had experienced "a problem with one of the workers." Brown was then interrupted by his attorney and discontinued the line of questioning. On redirect, the prosecutor elicited from the witness that some time prior to Ramirez's death, Brown was involved in an altercation with another employee, after which Brown commented, "I'd like to see [the employee] take a dip in the lake and not come back up."

At trial, defense counsel objected to the introduction of this evidence on the ground that it was beyond the scope of the cross-examination. In his brief on appeal, defendant asserts that the evidence was improper under rules 404 and 405 of the Utah Rules of Evidence.

■ Rule 103(a) of the Utah Rules of Evidence requires a clear and definite objection at trial to preserve an evidentiary error for appeal. *See also State v. Eldredge*, 773 P.2d 29, 34–35 (Utah), *cert. denied*, 493 U.S. 814, 110 S.Ct. 62, 107 L.Ed.2d 29 (1989). To preserve a particular evidentiary objection for appeal, a defendant must specifically state to the trial court the same grounds for objection presented on appeal. *State v. Van Matre*, 777 P.2d 459, 462 (Utah 1989). Defendant in this case cannot assert a violation of rules 404 and 405 as a ground for error on appeal when he made no such assertion at trial, unless it was plain error. To be plain error, however, an error must be both obvious and harmful. *Eldredge*, 773 P.2d at 35. In this case, the jury learned of a prior confrontation with another employee through the evidence Brown himself elicited. Consequently, we cannot conclude that admission of the evidence was either obviously erroneous or harmful.

## SUFFICIENCY OF EVIDENCE FOR AGGRAVATED ASSAULT

■ Defendant claims that the State presented insufficient evidence to support his conviction of aggravated assault because the evidence did not establish that he

exhibited "a show of immediate force or violence." Utah Code Ann. § 76–5–102(1)(b). Because similar evidence will likely be offered at a new trial, we address this issue.

▮▮▮ In reviewing a jury verdict to determine whether it was based on sufficient evidence, we view the evidence presented and all inferences to be drawn therefrom in a light most favorable to the verdict. *State v. Gardner*, 789 P.2d 273, 285 (Utah 1989), *cert. denied*, 494 U.S. 1090, 110 S.Ct. 1837, 108 L.Ed.2d 965 (1990). The jury, not the appellate court, should weigh the evidence and assess witness credibility. *State v. Booker*, 709 P.2d 342, 345 (Utah 1985). Thus, we will sustain the jury's verdict where there is any evidence or reasonable inferences that can be drawn from the evidence from which the jury could make findings of all the elements of the crime beyond a reasonable doubt. *Id.*

Brown was charged with aggravated assault under Utah Code Ann. § 76–5–103. Violating this section involves committing an assault, defined in Utah Code Ann. § 76–5–102 as "a threat, accompanied by a show of *immediate* force or violence, to do bodily injury to another." (Emphasis added.) Richard Anderson, the victim of defendant's aggravated assault, testified that when he stepped from his trailer to see what was happening, the four men were beating the victim a short distance away. Defendant raised a crescent wrench in his hand, pulled it back, and said to Anderson, "Do you want some of it too?"

Brown argues that immediacy requires close proximity and that he and Anderson were not close enough to make the act of raising the wrench a show of immediate force or violence. We tend to agree that proximity has some relevance in determining the immediacy of the threat. In this case, Anderson was walking out of a trailer in a remote fishing camp on the Great Salt Lake. Outside of his trailer, he observed four men beating a fellow employee. In this context, Brown raised a wrench and threatened Anderson. Although the transcript is unclear regarding the exact distance between Brown and Anderson, we are persuaded that in light of the surrounding circumstances, the jury could have found, beyond a reasonable doubt, that Brown's threat was accompanied by a "show of immediate force or violence, to do bodily injury to another." Utah Code Ann. § 76–5–102(1)(b).

### PROSECUTOR'S REFERENCE TO DEFENDANT AS "MAD DOG"

▮▮▮ In his closing argument to the jury, the prosecutor, referring to Brown and the three other defendants, stated, "There isn't one of us here who knows how we would react in a situation like that with four mad dogs out there beating on someone." Defendant objected to this statement shortly after it was made. He argues that the prosecutor's comment mandates reversal of his convictions.

▮▮▮ As we have frequently noted, "Counsel for both sides have 'considerably more freedom in closing argument' and 'a right to discuss fully from their standpoints the evidence and the inferences and deductions arising therefrom.'" *State v. Parsons*, 781 P.2d 1275, 1284 (Utah 1989) (quoting *State v. Lafferty*, 749 P.2d 1239, 1255 (Utah 1988) (quoting *State v. Valdez*, 513 P.2d 422, 426 (Utah 1973))). Prosecutors engage in misconduct, however, when they assert personal knowledge of the facts in issue or express personal opinion in the form of unsworn testimony that tends to "exploit the influence of the prosecutor's office and undermine the objective detachment that should separate a lawyer from the cause being argued." *Parsons*, 781 P.2d at 1284 (citing *Lafferty*, 749 P.2d at 1255; ABA Standards for Criminal Justice § 3–5.8 (2d ed. 1980)).

Referring to a defendant as a "mad dog" is the type of personal invective that reflects a lack of objective detachment a prosecutor should maintain in carrying out prosecutorial responsibilities. It should not be part of the prosecutor's rhetoric on remand. However, because we reverse for other reasons, we do not decide if the com-

ment was sufficiently egregious to warrant reversal.

### *ALLEN*-TYPE CHARGE TO JURY

■ Although defendant did not object to the instruction at trial, he argues on appeal that the trial court erroneously gave an *Allen*-type instruction to the jury before it began its deliberations. Instructing the jury, the court stated:

> The Court instructs the Jury that although the verdict to which each Juror agrees must, of course, be each Juror[']s own conclusion, and not a mere acquiescence in the conclusion of fellow Jurors yet, in order to bring eight minds to a unanimous result the Jurors should examine with candor the questions submitted to them, with due regard and deference to the opinions of each other. A dissenting Juror should consider whether their [sic] state of mind is a reasonable one, when it makes no impression on the minds of so many Jurors equally honest, equally intelligent, who have heard the same evidence, with an equal desire to arrive at the truth, under the sanction of the same oath. You are not to give up a conscientious conclusion after you have reached such a conclusion finally, but it is your duty to confer with your fellow Jurors carefully and earnestly, and with a desire to do absolute justice both to the State and to the Defendant.

An *Allen* charge takes its name from *Allen v. United States*, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896). In *Allen*, the United States Supreme Court approved a supplemental instruction given to a jury that was having difficulty arriving at a unanimous verdict. *Id.* at 501, 17 S.Ct. at 157. This type of instruction has since been criticized as tending to pressure jurors into giving up their sincere convictions merely because a majority reached a different conclusion. *See State v. Medina*, 738 P.2d 1021, 1022 n. 1 (Utah 1987). We acknowledge that a supplemental instruction has the potential to be coercive, depending on its content, if given to jurors who have reached an impasse. In this case, however, the charge was given prior to jury delibera-

tions and the instruction specifically directed the jurors not to give up their own "conscientious conclusions." In this context, the inherent danger of coercion resulting from the instruction is dissipated, if not lost. *See State v. Wilson*, 6 Kan.App.2d 302, 627 P.2d 1185, 1187, *aff'd and remanded*, 230 Kan. 287, 634 P.2d 1078 (1981). We reject Brown's assertion that this instruction "deprive[d] the Defendant of the benefit of the convictions of each individual juror." The trial court did not err in allowing this instruction.

### REIMBURSEMENT OF DEFENSE COSTS

■ Finally, defendant argues that it was improper for the trial court, as part of his sentence, to order him to reimburse the county for the costs of his defense. We will not set aside a sentence imposed by a trial court unless the sentence represents an abuse of discretion, the trial court failed to consider all relevant factors, or the sentence imposed exceeded the limits prescribed by law. *State v. Gibbons*, 779 P.2d 1133, 1135 (Utah 1989). Utah Code Ann. § 77-32a-1 allows the trial court to "require a convicted defendant to make restitution and pay costs." Section 77-32a-3, however, states that before including in the judgment a sentence that a defendant pay costs, the court must determine whether the defendant will be able to pay them. In this case, the court apparently failed to consider defendant's financial status before assessing defense costs. Accordingly, if this issue recurs on remand, we instruct the trial judge to consider and make findings regarding defendant's ability to pay any costs levied.

The conviction is reversed, and this matter is remanded to the district court for a new trial.

HOWE, A.C.J., and ZIMMERMAN, J., concur.

STEWART, Justice, concurring:

I concur in the majority opinion. I write only because I believe the majority ought not approve the jury instruction that it characterizes as an *Allen* charge. In my

view, the instruction given provides too much leverage to a majority of jurors to exert undue pressure on the minority. This has the potential effect of distorting the deliberative process whereby jurors, through the free exchange of their individual views, reach a consensus through discussion, reason, and argument. Jury instructions should promote the deliberative process by encouraging the discussion of evidence and instructions. That process should not be sacrificed in the interest of reaching a quick group decision.

I recognize that the instruction states that a juror is not to give up a "conscientious conclusion" after reaching such a conclusion. However, the instruction given at the beginning of deliberations weighs too heavily in favor of telling a juror to yield his or her conviction to the majority early on. In short, the instruction reinforces the opinion of the majority more than is appropriate, at least in the beginning of deliberations.

Perhaps it is justifiable to give a true *Allen* charge after a lengthy trial in which the jury, after full discussion of the evidence over a protracted period, is unable to agree. My fear is that this instruction may have the effect of causing jurors who are initially in a minority to yield their convictions before there is a full airing of the evidence and of each juror's views.

I do not believe, however, that on the facts of this case, the instruction was prejudicial error.

HALL, Chief Justice, dissenting.

I do not join the court in reversing the conviction on the ground of conflict of interest in the absence of a showing that defendant was in any way prejudiced by reason of his representation by a part-time city attorney. Nothing in the record reveals that defendant was afforded anything less than the undivided loyalty and able assistance of counsel he was entitled

to,[1] and it is not for us to speculate otherwise.

In addition, the prosecutorial duties of defense counsel were limited to violation of city ordinances,[2] whereas defendant was tried for a violation of state law. Hence, there was no conflict with defense counsel's duties as a city attorney.

The distinct differences in the prosecutorial responsibilities of county and city attorneys explain the reason the statutory prohibition against county attorneys acting as defense counsel[3] does not include city attorneys.

In any event, in view of the evidence adduced at trial, it is unlikely that a new trial will produce a different result.

---

1. Utah Code Ann. § 77–32–1(4).

2. Utah Code Ann. § 10–3–928 (amended in 1991 to permit prosecution of class A misdemeanors in the name of the State of Utah).

3. Utah Code Ann. § 17–18–1(9)(a) (Supp.1992) (formerly Utah Code Ann. § 17–18–2(10)(a)).