*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

**DISTRICT OF COLUMBIA COURT OF APPEALS**

No. 20-CF-73

MAURICE MITCHELL, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF2-13398-18)

(Hon. Michael O'Keefe, Trial Judge)

(Decided August 13, 2020)

*Samia Fam*, *Jaclyn Frankfurt*, *Shilpa S. Satoskar*, and *Daniel Gonen*, Public Defender Service, were on the motion for appellant.

*Timothy J. Shea*, United States Attorney at the time the motion was filed, *Elizabeth Trosman* and *Ethan L. Carroll*, Assistant United States Attorneys, were on the opposition for appellee.

Before GLICKMAN, BECKWITH, and DEAHL, *Associate Judges*.

DEAHL, *Associate Judge*: Maurice Mitchell brought an emergency motion challenging the Superior Court's denial of his request to stay execution of his sentence and for release pending appeal under D.C. Code § 23-1325(c). That provision instructs that a convicted person sentenced to a term of imprisonment

shall be detained pending appeal unless clear and convincing evidence demonstrates, among other things, that his appeal "raises a substantial question of law or fact likely to result in a reversal or an order for new trial." D.C. Code § 23-1325(c) (2012 Repl.). The trial court denied Mr. Mitchell's motion for release because it found that his Fourth Amendment suppression claim—the only claim he has indicated he will raise on appeal—did not satisfy this substantial question requirement. We issued an order on April 8, 2020, reversing the trial court's denial and remanding the case for further proceedings. This opinion expands upon that ruling and clarifies § 23-1325(c)'s substantial question requirement.

**I.**

The evidence presented at the suppression hearing indicated the following. At about 10:45 p.m. on September 10, 2018, Officers Karina Phillip and Willmino Pantaleon were parked in their police cruiser in an alley off the 2400 block of 4th Street NE. As they sat in their marked car, Officer Phillip saw an alert from the "ShotSpotter app"[1] on her cell phone, indicating that it had detected a single

---

[1] Officer Phillip explained that ShotSpotter is a system used to detect and locate gunshots in the District, and that the application on her phone would send alerts if ShotSpotter detected activity in her area.

gunshot about a block and a half away from their location, in the 2300 block of 4th Street NE. Neither officer heard a gunshot, but soon after the cell phone alert, they received a call over their radio confirming that ShotSpotter had indeed detected a single shot in the area. They decided to investigate and began driving out of the alley toward 4th Street NE.

When the officers reached the mouth of the alley, within "two to five minutes of the [ShotSpotter] notification," they saw Maurice Mitchell. He was riding his bike "at a fast pace" toward them and coming from the general direction of the suspected gunshot. Mr. Mitchell was wearing a black hoodie and black sweatpants. And while there was testimony that he also had a black mask partially covering his face, the trial court found the officers' "testimony diverged" on that point and it did not attempt resolve the discrepancies.[2] Mr. Mitchell was the first and only person they saw in the immediate area,[3] and the officers stopped their car

---

[2] While the mask was sometimes referred to as a "ski mask," Officer Pantaleon made clear that it was not "one of those masks . . . where it's just the eyes cut out," but instead one that covered the perimeter of Mr. Mitchell's face.

[3] As the trial court noted, the body-worn camera of another officer who responded to the exact location provided by ShotSpotter showed other people outside in that area. And as the trial court further described, the "body-worn camera footage of Officers Phillip and Panteleon [sic] show that there were other individuals in the area" when they eventually stopped Mr. Mitchell, close to where they first saw him and near where the gunshot was detected. That does not cast

*(continued…)*

so that Mr. Mitchell could "pass by on his bicycle." Mr. Mitchell flinched upon seeing the police cruiser enter his lane of travel, and he began pedaling "a little bit faster" after seeing the officers. When he passed the police cruiser Mr. Mitchell looked back over his shoulder as he immediately made a right turn into the parking lot of the Edgewood Apartments complex. The officers drove their cruiser into the parking lot just behind him and Mr. Mitchell kept "going at a faster and faster pace" and "kept looking back" over his shoulder at the cruiser as the officers tailed him. The officers did not summon Mr. Mitchell or direct him to stop in any way while he rode his bicycle.

When Mr. Mitchell stopped cycling at the entrance of the Edgewood Apartments—which, unbeknownst to the officers, is where he lived—the officers activated their lights and directed him to stop and show his hands. Mr. Mitchell complied. The government concedes, for purposes of this emergency appeal at least, that Mr. Mitchell was seized for Fourth Amendment purposes upon

_____

*(…continued)*

doubt on the officers' testimony that Mr. Mitchell was the first and only person they saw as they pulled out of the alley. It does reflect that officers came upon Mr. Mitchell before surveying the surrounding area, though, and it undermines a potential inference one might otherwise draw from their testimony, namely, that other people were not outside in the area at that time.

complying with that order.[4]  The officers then approached him and saw what appeared to be the butt of a rifle sticking out from a bag that he was carrying. They opened the bag and recovered a Winchester rifle with one spent shell casing inside the chamber.  They also searched Mr. Mitchell and found two live rounds of ammunition in his pocket.

Mr. Mitchell was indicted for a host of charges related to the possession and discharge of a firearm.[5]  Before trial, he moved to suppress the firearm and ammunition found on him, arguing that their recovery was the fruit of an unconstitutional stop in violation of the Fourth Amendment.  That motion was denied.  Mr. Mitchell agreed to a stipulated trial while preserving his right to

---

[4]  The trial court's findings suggest that it was not until *after* Mr. Mitchell complied with the directions to stop and show his hands that he was "blading," or standing with one side facing toward the officers as if to conceal his other side. Given the government's present concession regarding the timing of Mr. Mitchell's seizure, we treat any post-seizure blading as irrelevant to the Fourth Amendment analysis.  *See Terry v. Ohio*, 392 U.S. 1, 19–20 (1968) (Fourth Amendment inquiry looks to "whether the officer's action [constituting a search or seizure] was justified at its inception").

[5]  Mr. Mitchell was charged with unlawful possession of a firearm, D.C. Code § 22-4503(a)(1) (2012 Repl. & 2020 Supp.), carrying a rifle or shotgun outside the home or place of business, D.C. Code § 22-4504(a-1)(a)(2), possession of an unregistered firearm, D.C. Code § 7-2502.01(a) (2018 Repl.), unlawful possession of ammunition, D.C. Code § 7-2506.01(3), and wearing a hood or mask while engaged in unlawful conduct, D.C. Code § 22-3312.03.

appeal the suppression ruling. The trial court convicted him of all counts and sentenced him to incarceration for one year and one day.

Mr. Mitchell sought to stay the execution of his sentence pending appeal under D.C. Code § 23-1325(c). The trial court denied the motion, concluding that Mr. Mitchell's appeal of the court's suppression ruling did not raise a substantial question of law or fact likely to result in reversal of his convictions, as required by § 23-1325(c). The basis for the trial court's conclusion was that it believed itself to be "correct" in denying the suppression motion: "I think it was correct. Obviously, if I didn't think it was correct, I would have changed it, so I don't see there's a legitimate basis to stay anything at this point pending appeal."

## II.

### A.

Mr. Mitchell now brings this emergency motion asking us to order his release pending appeal under D.C. Code § 23-1325(c), which provides:

> A person who has been convicted of an offense and sentenced to a term of confinement or imprisonment and has filed an appeal . . . shall be detained unless the judicial officer finds by clear and convincing evidence that (1) the person is not likely to flee or pose a danger to

any other person or to the property of others, and (2) the appeal . . . raises a substantial question of law or fact likely to result in a reversal or an order for new trial.

In denying Mr. Mitchell's motion for release pending appeal, the trial court relied exclusively on the second, "substantial question" part of this required showing. The court reasoned that because the suppression ruling was "correct" in its view, it could not also find that the ruling was likely to be reversed on appeal. This reasoning is premised on a misinterpretation of § 23-1325(c)'s substantial question requirement.

Contrary to the trial court's analysis, § 23-1325(c) does not require a finding that it is more likely than not that appellant's convictions will be reversed on appeal. Instead, as the United States Courts of Appeals have unanimously found in interpreting the federal analog to § 23-1325(c), 18 U.S.C. § 3143(b) (2018),[6] there

---

[6] 18 U.S.C. § 3143(b) reads: "(1) Except as provided in paragraph (2), the judicial officer shall order that a person who has been found guilty of an offense and sentenced to a term of imprisonment, and who has filed an appeal . . . be detained, unless the judicial officer finds— (A) by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released under section 3142(b) or (c) of this title; and (B) that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in— (i) reversal, (ii) an order for a new trial, (iii) a sentence that does not include a term of imprisonment, or (iv) a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process."

are two steps to analyzing this second requirement: "(1) Does the appeal raise a substantial question? (2) If so, would the resolution of that question in the defendant's favor be likely to lead to reversal?" *United States v. Perholtz*, 836 F.2d 554, 555 (D.C. Cir. 1987); *see also United States v. Steinhorn*, 927 F.2d 195, 196 (4th Cir. 1991); *United States v. Pollard*, 778 F.2d 1177, 1181–82 (6th Cir. 1985); *United States v. Bayko*, 774 F.2d 516, 522–23 (1st Cir. 1985); *United States v. Bilanzich*, 771 F.2d 292, 298 (7th Cir. 1985); *United States v. Affleck*, 765 F.2d 944, 952 (10th Cir. 1985) (en banc); *United States v. Valera-Elizondo*, 761 F.2d 1020, 1024–25 (5th Cir. 1985); *United States v. Randell*, 761 F.2d 122, 124–25 (2d Cir. 1985); *United States v. Powell*, 761 F.2d 1227, 1230–31 (8th Cir. 1985) (en banc); *United States v. Handy*, 761 F.2d 1279, 1280–81 (9th Cir. 1985); *United States v. Giancola*, 754 F.2d 898, 900–01 (11th Cir. 1985); *United States v. Miller*, 753 F.2d 19, 23–24 (3d Cir. 1985). We agree with the unanimous view of the United States Courts of Appeals that the substantial question requirement "should not be read to mean that 'it [is] more likely than not' that [the] conviction would be reversed upon appeal." *Bayko*, 774 F.2d at 521. The second prong of § 23-1325(c) is instead satisfied whenever the appellant raises a substantial question of law which, if resolved in appellant's favor, is likely to result in reversal.[7]

---

[7] While D.C. Code § 23-1325(c) is substantially similar to 18 U.S.C. § 3143(b), we note one potentially salient difference. The federal statute applies

*(continued…)*

This is the better interpretation because, among other reasons, the stricter one advanced by the government and adopted by the trial court would be a virtual nullity. When a trial court detects a reversible error in its own ruling—i.e., one that is more likely than not to result in reversal—it has both the incentive and the ability to correct that error. *See, e.g.*, Super. Ct. Crim. R. 26.3, 33, 35. Judges generally "do not knowingly leave substantial errors uncorrected, or deliberately misconstrue applicable precedent." *Miller*, 753 F.2d at 23. Like the United States Courts of Appeals before us, we are "unwilling to attribute to Congress the cynicism that would underlie the provision were it to be read as requiring the [trial] court to determine the likelihood of its own error," because a trial judge "who, on reflection, concludes that s/he erred may rectify that error when ruling on post-trial

---

*(…continued)*

the "clear and convincing evidence" standard only to the question whether the defendant is likely to flee or pose a danger, but not to the legal question whether the defendant has raised a substantial question of law or fact likely to result in reversal. Our statute, on its terms, seems to apply the clear and convincing evidence standard to both inquiries, by virtue of the perhaps infelicitous placement of the numeral (1) in § 23-1325 (if it were moved before the "by clear and convincing evidence" clause, it would read as the federal statute does). We need not dwell on this distinction because that evidentiary burden does not affect whether the legal issue presented here is substantial. *See Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 114 (2011) (Breyer, J., concurring) ("[I]n this area of law as in others the evidentiary standard of proof applies to questions of fact and not to questions of law.") (citing *Addington v. Texas*, 441 U.S. 418, 423 (1979)); *Marinelarena v. Barr*, 930 F.3d 1039, 1049 (9th Cir. 2019), *petition for cert. filed*, No. 19-632 (U.S. Nov. 15, 2019) ("[A] pure question of law . . . is unaffected by statutory burdens of proof.").

motions,"[8] rather than letting the conviction stand for the duration of an appeal. *Id.* Indeed, while the United States argues against our interpretation in the present case, it has previously and repeatedly endorsed our view "that the language requiring 'a substantial question of law or fact' should not be read to mean that 'it was more likely than not' that conviction would be reversed upon appeal." *Bayko*, 774 F.2d at 521; *see Affleck*, 765 F.2d at 952 ("The parties . . . contend that we should interpret [§ 3143(b)(2)] in light of the two-step analysis announced by the Third Circuit in *United States v. Miller*, 753 F.2d 19 (3d Cir. 1985)."); *Valera-Elizondo*, 761 F.2d at 1024 ("All parties, as do we, essentially agree that *Miller* states the proper construction of the Act."); *Randell*, 761 F.2d at 125 ("Neither petitioner nor the government has contested reliance on the *Miller* analysis."); *Powell*, 761 F.2d at 1230 ("The United States takes the position that the portion of the statute in question requires two separate determinations: (1) whether the appeal raises a substantial question, and (2) whether, if the defendant prevails on this

---

[8] We appreciate the conceptual possibility that a trial judge might think herself correct yet anticipate being overruled on appeal, so that she might both think that she has committed no reversible error but nonetheless think that she is likely to be reversed on appeal. We doubt, however, that Congress would have legislated only to account for that idiosyncratic scenario, and there is no indication that is what it had in mind in passing the federal release pending appeal provision or the District's analog to it.

question, reversal or an order for a new trial is likely."); *Miller*, 753 F.2d at 23 ("The parties are in substantial agreement with this construction of the statute.").

There is some residual disagreement among the United States Courts of Appeals on the more granular point of what it means for an appeal to raise a "substantial question." *Compare, e.g.*, *Perholtz*, 836 F.2d at 555–56 ("substantial question" means "a close question or one that very well could be decided the other way"), *with Handy*, 761 F.2d at 1283 ("a 'substantial question' is one that is 'fairly debatable'") (quoting *D'Aquino v. United States*, 180 F.2d 271, 272 (9th Cir. 1950)). The United States Courts of Appeals fall into two camps, and the litigants here are at odds over which reflects the better view. The approach advanced by Mr. Mitchell is that a "substantial question" means one that is "fairly debatable." *See, e.g.*, *Handy*, 761 F.2d at 1283. The government opposes that as too lenient a standard, and one that is disclaimed by the "overwhelming majority of circuits." The government instead suggests, if pressed to choose among the views of the United States Courts of Appeals, that a substantial question means "a close question or one that very well could be decided the other way." *See, e.g.*, *Perholtz*, 836 F.2d at 555–56.

We do not take a position on this subsidiary dispute because we conclude that Mr. Mitchell has raised a substantial question of law or fact sufficient to satisfy § 23-1325(c) under either view. That is, Mr. Mitchell has cleared the government's higher bar because his Fourth Amendment claim raises "a close question . . . that very well could be decided the other way." *Perholtz*, 836 F.2d at 555–56. The underlying Fourth Amendment question is whether, at the time the officers stopped Mr. Mitchell, they had reasonable articulable suspicion that he was engaged in criminal activity, i.e., that he fired the suspected gunshot. *See Terry v. Ohio*, 392 U.S. 1, 21, 30–31 (1968). That is a close question here, where the basic facts supporting reasonable articulable suspicion are that Mr. Mitchell was seen (1) riding his bicycle at a fast pace, (2) late at night, (3) several minutes after a suspected gunshot was detected by ShotSpotter, (4) about a block and a half from where ShotSpotter located the suspected gunshot, (5) coming from the general direction of the suspected gunshot, and (6) Mr. Mitchell began pedaling slightly faster upon seeing the officers' patrol vehicle.

On the other side of the ledger, there was no report of a crime, so Mr. Mitchell did not match the description of any possible suspect. Mr. Mitchell thus did not match any suspect's height, weight, build, race, age, gender, or dress. He did not match any (non-existent) description of their direction, mode, or speed of

travel. Additionally, several factors undermine the importance that the government and the trial court would place on Mr. Mitchell riding his bike at a fast clip. First, one might think that Mr. Mitchell's pace and his proximity to the suspected gunshot, when taken together, are more exculpatory than inculpatory: An individual who had begun biking at a fast pace immediately, or even shortly, after the detected gunshot would have made it considerably farther than a block and a half in the several minutes[9] that elapsed between the gunshot and when officers first saw Mr. Mitchell.[10]

And while the government characterizes Mr. Mitchell's behavior after seeing the officers' patrol car as "flight," that descriptor is ill-fitting. The officers testified that Mr. Mitchell was already riding his bike at a fast pace when they

---

[9] The trial court found that the officers saw Mr. Mitchell within "two to five minutes of the [ShotSpotter] notification," and the government invites us to treat that as a finding that the officers saw Mr. Mitchell within two minutes of the gunshot. We decline the invitation. On its face, the trial court's finding does not purport to state the gap in time between the gunshot and the officers seeing Mr. Mitchell, but instead notes the gap in time between the ShotSpotter *notification* and the first sighting. The trial court elsewhere in its findings noted that there were "about two minutes" between the shot itself and the ShotSpotter notification, which is no doubt why the government repeatedly described the gap in time between the shot and officers first seeing Mr. Mitchell as "about five minutes," and "within five minutes of them seeing him."

[10] If Mr. Mitchell rode his bike for four minutes at fifteen miles per hour, for example, he would have traversed one mile.

pulled up to his lane of travel and stopped for him to pass. No matter what direction Mr. Mitchell went after coming upon the officers—forward or backward, left or right—would have meant traveling away from the officers because they were in the same place. We reject the notion that a person who is merely continuing on their way could be described as fleeing in any meaningful sense of the word. The government further stresses that Mr. Mitchell began pedaling faster and looking over his shoulder upon being tailed by the police car. That behavior also adds little to the calculus. Cyclists riding on city streets will routinely look over their shoulders in order to monitor the traffic behind them.[11] They might even reasonably speed up in the hopes of putting some distance between themselves and a car that is following closely, as was the case here.

We need not resolve the Fourth Amendment question beyond finding that it is a close one. On facts that, at first blush, provide roughly as much cause for suspicion as these, we have sometimes found that reasonable articulable suspicion exists, *see Pridgen v. United States*, 134 A.3d 297, 303–05 (D.C. 2016); *In re*

---

[11] *See* Jason Sumner, *Your Definitive Guide to Riding Your Bike in Traffic*, Bicycling (Feb. 16, 2017), https://www.bicycling.com/rides/a20023779/your-definitive-guide-to-riding-your-bike-in-traffic/ https://perma.cc/8P9R-A75Z ("To stay safe in traffic, you need to keep track of what's happening behind you, so it's a good idea to master the skill of looking behind you without swerving," particularly by "look[ing] over your left shoulder.").

*D.A.D.*, 763 A.2d 1152, 1156–57 & n.6 (D.C. 2000), and sometimes found that it does not, *see Posey v. United States*, 201 A.3d 1198, 1203 (D.C. 2019); *Miles v. United States*, 181 A.3d 633, 642–45 (D.C. 2018). That is not to suggest that these precedents are in any serious tension. Only that it is not readily apparent which side of the divide this case falls on, a question that we believe fair-minded jurists might reasonably disagree about. We will save the application and any necessary reconciliation of these precedents for whenever this appeal is decided on the merits. For now, it is enough to find that Mr. Mitchell's Fourth Amendment claim (1) raises a substantial question of law that is (2) likely to lead to reversal if resolved in his favor.[12]

**B.**

Mr. Mitchell was also required to demonstrate that he was "not likely to flee or pose a danger to any other person or to the property of others" to obtain release pending appeal under § 23-1325(c). As we explained in our earlier April 8 order

---

[12] There is no dispute on the second prong of this two-step inquiry. If Mr. Mitchell's Fourth Amendment claim is resolved in his favor on appeal, the government does not contest that the error would warrant reversal.

remanding the case, whether Mr. Mitchell meets this standard is a question for the trial court to address in the first instance.

Mr. Mitchell argues that a remand is unwarranted because the trial court (at least implicitly) already found that he satisfies this condition when it previously ordered him released pending sentencing under D.C. Code § 23-1325(b). It is true that § 23-1325(b)'s standard for release while awaiting sentencing invokes the same "not likely to flee or pose a danger" requirement found in § 23-1325(c), but they address different durations and different circumstances. A § 23-1325(b) finding looks to the relatively brief period between conviction and sentencing, whereas a § 23-1325(c) finding addresses the considerably longer period that it takes for an appeal to be resolved. A trial court could logically find that a convicted person is not likely to flee or pose a danger to others during the brief pre-sentencing period while drawing the opposite conclusion as to the much longer period of an appeal's pendency. Likewise, a trial court could find that a convicted person who is unaware of a forthcoming sentence poses no appreciable risk of flight or danger to others, while finding that the imposition of a (possibly lengthy) sentence changes the calculus. We thus will not take a § 23-1325(b) finding to logically entail or imply the same finding under § 23-1325(c). A remand was thus appropriate in this case for the trial court to address § 23-1325(c)'s "not likely to

flee or pose a danger to any other person or to the property of others" requirement in the first instance.[13]

## III.

For these reasons, expanding upon those we offered in our April 8, 2020, order, we reversed the trial court's order denying Mr. Mitchell's motion for release

---

[13] Mr. Mitchell's emergency motion came to us in the midst of the still-raging COVID-19 pandemic, and he cites to the particular dangers to prison and jail populations as a reason for this court to circumvent a remand. The premise of his argument, that individuals in jails and prisons are particularly vulnerable during this pandemic, is beyond doubt and could hardly be overstated. *See* Joshua Rich, *Coronavirus Disproportionately Harms U.S. Prison Population*, UCLA Newsroom (July 8, 2020), https://newsroom.ucla.edu/releases/coronavirus-disproportionately-harms-u-s-prison-population https://perma.cc/9BWS-YADP ("People incarcerated in U.S. prisons tested positive for COVID-19 at a rate 5.5 times higher than the general public."); *A State-by-State Look at Coronavirus in Prisons,* Marshall Project (August 6, 2020), www.themarshallproject.org/2020/05/01/a-state-by-state-look-at-coronavirus-in-prisons https://perma.cc/6S7P-AFA7 (counting, as of August 6, 2020, about 86,000 infected in our nation's prisons). Mindful of that, we expedited the emergency briefing in this case, issued our April 8 order within twenty-four hours of the briefing's completion, and expressed our confidence that the trial court would likewise consider this remaining § 23-1325(c) issue with due urgency. Not only is the likelihood of flight and future dangerousness an inquiry for the trial court in the first instance as a matter of law, it is an inquiry that the trial court is better equipped to address with urgency given its superior familiarity with the defendant's history and present circumstances. Our confidence was not misplaced. Less than twenty-four hours after we issued our April 8 order reversing and remanding, the trial court promptly concluded that Mr. Mitchell satisfied this first prong and ordered him released pending appeal.

pending appeal under § 23-1325(c) and remanded this case for further proceedings

consistent with this opinion.